Ronald DAWSON, Marlon Lee Hess, James L. Caldwell, William Burton, Garrett Norris, Charles Scott, Chris Dillard and James Martin, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Earl G. KENDRICK, individually and in his official capacity as Sheriff of Mercer County, West Virginia; Luther H. Byrd, individually and in his official capacity as Mercer County Commissioner and as representative of all other members of the Commission; Joe Coburn, individually and in his official capacity as Mercer County Commissioner and President of the Mercer County Commission, and as representative of all other members of the Commission; Clarence H. Six, individually and in his official capacity as Mercer County Commissioner, and as representative of all other members of the Commission; Mercer County Commission; Ricky Lee Lambert, individually and in his official capacity as jailer; and Harvey D. Wilson, individually and in his official capacity as Clerk of the Mercer County Commission, Defendants.

Civ. A. No. 78–1076.

United States District Court, S. D. West Virginia, Bluefield Division.

Aug. 10, 1981.

Tobias J. Hirshman, Charleston, W. Va., for plaintiffs.

David W. Knight, Charles T. Cunningham, Princeton, W. Va., for defendants.

FINDINGS OF FACT

CONCLUSIONS OF LAW

OPINION AND ORDER

COPENHAVER, District Judge.

## CONTENTS

Introduction 1257

I. Findings of Fact

 Generally 1259
 Population and
 Operational Costs 1261
 Plumbing 1262
 Lighting 1263
 General Sanitary
 & Health Con-
 ditions 1263
 Deputy Sheriffs 1265
 Fire Detection 1266
 Sufficiency of
 Housing & Super-
 vision 1268
 Classification 1270
 Rules and Regula-
 tions 1271
 Imposition of
 Punishment 1271
 Administrative
 Segregation 1271
 Clothing 1272
 Toilet Articles 1272
 Exercise 1272
 Medical & Dental 1272
 Nutrition 1273
 Mail 1275
 Telephones 1276
 Visitation 1276
 Reading Materials 1277
 Rehab Programs 1277
 Access to the
 Courts 1279
 Attorney/Client
 Interview Facili-
 ties 1279
 Possible Discrimi-
 nation 1279
 Other Conditions 1280
 Conclusions 1280

II. Conclusions of Law—
 Generally

 The Function of
 Constitutional
 Review 1280

 Eighth Amendment
 and Fourteenth
 Amendment 1282
 State Statutory
 Standards 1284
 Totality of Con-
 ditions & Discrete
 Adjudication
 Analyses 1285
 Equal Protection 1286

III. Conclusions of Law—
 The Constitutionality
 of Conditions and
 Practices at the
 Mercer County Jail

 A. Plumbing 1287
 B. Lighting 1288
 C. Bedding, Clothing
 & Toilet Articles 1288
 D. Housekeeping 1289
 E. Prisoner Safety 1289
 F. Overcrowding 1294
 G. Nutrition 1297
 H. Exercise 1298
 I. Discipline 1301
 J. Medical Care 1306
 K. Visitation 1308
 L. Mail 1309
 M. Access to the
 Courts 1312
 N. Segregated Con-
 finement 1314
 O. Rehab. & Reading
 Materials 1315
 P. Voting 1316
 Q. Female Prisoners 1316

IV. ORDER 1318

## Introduction

The named plaintiffs in this civil action brought pursuant to 42 U.S.C. § 1983 are certain past and present inmates of the Mercer County Jail located in Princeton, West Virginia. Plaintiffs have asserted extensive denials of their various constitutional rights due to the conditions they allege exist at the jail. The complaint does not focus upon an isolated condition or even

group of conditions. Rather, plaintiffs have launched a comprehensive assault upon all of the physical aspects of the jail and virtually every procedure by which the jail is operated and maintained.

The court has conditionally certified this case as a class action. The class is composed of all persons who have been, presently are, or shall in the future be confined in the jail, excluding those whose claims are barred by statutes of limitation or laches. The class is subdivided into two parts with one subclass being composed of all members of the class who are pre-trial detainees and the other being all members of the class who have been confined in the jail following trial or conviction for some crime.

The trial to the court of plaintiffs' requests for both a preliminary and a permanent injunction and for declaratory relief were consolidated for hearing. Trial of the damages issues has been postponed until adjudication of the requests for injunctive and declaratory relief.

The claims against the physical aspects of the jail allege inadequate plumbing and lighting; exposure to risk of injury or death by fire due to inadequate fire escape routes; the lack of adequate facilities and programs for indoor and outdoor exercise and recreation; the lack of light, toilet facilities, and showers in the solitary confinement cells; the lack of adequate facilities in which an inmate may consult with an attorney; and, the presence of unsanitary and unhealthful conditions in the jail in general such as filth and vermin. Plaintiffs complain as well of the manner in which the jail is operated and the lack of numerous necessary services, alleging: inadequate medical, dental and nursing care; nutritionally inadequate meals; the failure to provide clothing; the failure to furnish various toilet articles and grooming aids; insufficient numbers of guards and deputy sheriffs stationed in the jail so as to endanger the health and safety of the inmates; the lack of written rules to inform the inmates of their rights and responsibilities; the failure to provide vocational, educational, or other rehabilitative programs; the lack of an adequate classification system of the inmates, leading in turn to insufficient supervision and indiscriminate housing of the inmates; inadequate handling of inmate mail and access to telephones; the failure to provide sufficient reading materials; inadequate visitation schedules and poor facilities in which the inmates may meet with their visitors; the arbitrary imposition of punishment upon inmates who are alleged to have broken the unwritten jail rules without a hearing or other protection; and the general imposition of discriminatory treatment upon the inmates by the jailkeepers. Plaintiffs also assert that their access to the courts is being impinged upon because they are denied access to their attorneys and to various legal materials, including a law library. A separate claim of some of the inmates alleges the failure of the jailkeepers to adequately provide the lesser degree of incarceration to which pre-trial detainees are said to be entitled. The issues presented conclude with additional claims premised upon the alleged failure of the jailkeepers to comply with various statutory duties which repeat the items set forth above.[1]

## I. Findings of Fact

### Generally

In addition to the oral testimony and exhibits received during the trial and the view of the jail by the court during the course of the trial, the parties have entered

---

1. On October 27, 1980, plaintiffs filed a motion for expedited injunctive relief in the wake of two suicides which occurred at the Mercer County Jail on April 15, 1980, and September 28, 1980. Plaintiffs' motion prayed, inter alia, for the entry of an order enjoining defendants from incarcerating members of the plaintiff class in isolation where inadequate provisions exist for their safety. Following the hearing held on the motion and pursuant to the parties' agreement reached on many of the issues raised by the motion, the court entered an order on November 5, 1980, granting in substantial part the relief sought by plaintiffs. By order entered on January 21, 1981, the November 5, 1980 decree was continued in effect until further order of the court.

into several stipulations of fact.[2] The court adopts all of the stipulations of fact as its own and incorporates them in these findings by reference. The court's findings of fact, in addition to the stipulations, are set forth in the following discussion.

The Mercer County Jail is operated by the Mercer County Sheriff's Department and is financed by the Mercer County Commission. The jail, which is the only primarily adult detention center operated by the county, is located within the Mercer County Courthouse in Princeton, West Virginia. The courthouse is a three-story building plus a basement. The entrance to the jail is located at the basement level. The basement houses the jail control room, the kitchen facilities, the drunk tank, and the so-called juvenile area.[3] The sheriff's office proper is located on the first floor of the courthouse. The main portion of the jail is located on the entire third floor of the building. Access to the jail facilities on the third floor is by three means: an elevator which rises from the basement to the third floor; a staircase rising from the basement to the third floor with an exit to the sheriff's office on the first floor and an exit into the prosecuting attorney's office; and a small elevator which stops at the third floor and at the second floor near the criminal courtroom on that floor. The small elevator does not continue downward past the second floor.

The entire courthouse was designed in 1929 and was built in 1930–31. General maintenance of the water, toilet, and lighting facilities has been undertaken from time to time in response to prisoner abuse and the aging of the building. Although routine maintenance checks are not made by a professional firm, the deputies report maintenance needs as they arise.

The one instance of major repair and maintenance work on the courthouse took place in 1977–78 under the direction of an architect, Alex Mahood, at a total cost for the jail areas of approximately $65,000.[4] In the main, these repairs constituted maintenance rather than remodeling and, to a significant degree, benefitted the facilities on the second floor, particularly the criminal courtroom.

The third floor of the courthouse contains the bulk of the prisoners' cells. There are four basic cell areas—federal side, county side, city side, and trusty side—plus three other areas known as sweat cells, side cells or women's cells, and the dungeon.

The county side consists of a dayroom measuring 12 feet by 45 feet (540 square

2. A consolidation of the stipulations made as of February 2, 1979, was filed on February 27, 1979. The parties have also stipulated certain facts relating to the West Virginia Penitentiary which the court admits into evidence as generally relevant. Other stipulations have recently been filed as noted herein.

3. Certain areas and cells in the jail are identified by prisoners and staff at the jail by commonly accepted names which are not necessarily descriptive of their use or uses. These include the juvenile area and juvenile cells, side or women's cells, sweat cells, federal side, city side, county side, trusty side and dungeon or second tank cell.

4. This work consisted of the following: cleaning the jail; replacing, adjusting, and glazing defective and broken windows, sash, and glass on the third floor; replacing broken visitors' windows in the doors and walls between dayrooms and visitors' corridors; replacing the floor tile in the area immediately around a new floor drain and around two newly sealed access openings; painting the jail; replacing strainers on five floor drains in guards' corridors; re-moving and replacing one shower compartment in the "guards' toilet" adjacent to the attorney-client interview room; removing and replacing the concrete floors and floor drains in seven showers including installation of a new lead pan waterproofing in each shower; installation of the new floor drains mentioned above; sealing of the two access openings in the floor mentioned above; removing and replacing waste piping from plumbing fixtures in guards' toilet, shower, and adjoining detention room including the replacing of the drain line from the fixtures located above the ceiling of the criminal courtroom and its adjacent corridor on the second floor; similar replacement of plumbing fixtures in the niches between two detention rooms also located above the criminal courtroom and its adjacent corridor; installation of drain piping from one new floor drain in the prisoners' corridor also located above the criminal courtroom and its adjacent corridor; and the installing of forty-two new light fixtures, and repairing of electric wiring at each fixture in jail dayrooms and cells.

feet) and six cells measuring 8 feet by 12 feet (96 square feet). Each cell contains eight bunks. Of the 96 square feet in each cell, the bunks take up the majority of the floor space. The cells are all in one line and are located across from the dayroom. In between the cells and the dayroom is a guards' corridor. The dayroom's opposite side is separated from the exterior wall by another guards' corridor. Thus, the cells and dayroom are within the interior of the building. The exterior wall has five windows which are the sole sources of natural light for the county side.

The federal and city sides differ from the county side only in their dimensions and number of windows. The dayrooms are 13 feet by 32 feet (416 square feet) and there are only four cells measuring 8 feet by 12 feet on each of the two sides. Also, the federal and city sides each have four outside windows.

The trusty side is smaller with only three cells and a dayroom measuring 12 feet by 24 feet (288 square feet). It has access to only two outside windows.

The side or women's cells consist of three rooms located along an exterior wall. Each cell measures 11 feet by 12 feet (132 square feet), has four beds, and one outside window. Each room has a solid door with a small glass window and, unlike the four main cell areas, the side cells do not have direct access to either a dayroom or a shower.

Near the small elevator on the third floor is a room measuring approximately 4 feet by 7 feet. It is without windows or access to any natural light; neither does it have furnishings, plumbing, floor drains or ventilation. This room is the dungeon or second tank area.

Finally, the sweat cells consist of four cells measuring 5 feet by 7 feet with two bunks each. There is no dayroom for the sweat cells.

In the basement of the courthouse, the jail facilities occupy nearly one-half of the available floor space. The two areas of immediate concern are the drunk tank and the juvenile section. The drunk tank is a room with a concrete floor and steel and concrete walls measuring 14 feet by 10 feet (140 square feet). The room does not have access to natural light and is barren of all furnishings except for a one piece toilet-sink unit. There is almost no ventilation in the drunk tank when the door is closed. The juvenile section consists of four cells measuring 14 feet by 7 feet (198 square feet). Two of the cells in this area contain three bunks each and the other two contain two bunks each. Juveniles are not generally housed at the jail; rather, they are supposed to be sent to the Mercer County Juvenile Detention Center. Consequently, the juvenile section is more often used as an isolation area for adult prisoners. There is no direct access to a shower from the cell area. The heating system in this section consists of steam radiators located near the ceiling. This system is antiquated and very ineffective.

The jail's office space is located in the basement and is centered around the control room. This area contains the jail's facilities for booking of incoming inmates, radio equipment for communications with deputies in the field, jail records, and jail security equipment such as the controls for the outside television scanner and the controls for the remote control door facility which regulates ingress and egress to and from the jail.

*Population and Operational Costs*

The primary purpose of the Mercer County Jail is to house persons being detained on criminal charges who are either awaiting release on bond or who have not been able to post bond, persons convicted of misdemeanors who are serving a sentence of one year or less, and convicted persons who are awaiting transportation to another facility. While at one time persons involved with federal offenses were held there, the Mercer County Jail has been found not to meet federal standards for the incarceration of federal prisoners. Accordingly, federal prisoners are no longer housed there except when necessary to enable a sentenced offender to engage in a work-release program

in the Princeton area as prescribed by the sentencing federal judge.

Defendants offered the following chart concerning the number of jail inmates from January 1, 1978, through July 31, 1978. Plaintiffs offered their own chart taken from their Exhibits 8 and 38. Both charts find their sources in the records kept by the jail administration and both are very close in their results. The court will draw from the chart offered by the defendants. In the period January 1 through July 31, 1978, there were 1303 inmates incarcerated in the jail. Broken down into percentages and numbers as opposed to time actually spent in the jail, the results are:

| Time Spent at Jail | Number of Inmates | Percentage of Population |
|---|---|---|
| 24 hours or less | 773 | 59.33% |
| Up to 3 days | 220 | 16.89 |
| Up to 5 days | 122 | 9.37 |
| Up to 10 days | 85 | 6.53 |
| Up to 30 days | 45 | 3.45 |
| Up to 60 days | 14 | 1.06 |
| Up to 90 days | 6 | 0.46 |
| Up to 180 days | 15 | 1.15 |
| Up to 270 days | 4 | 0.31 |
| Still serving as of 11/6/78 | 2 | 0.15 |
| Not countable | 17 | 1.30 |
| | 1303 | 100.00% |

The parties have stipulated that between 75% and 85% of the inmates are pre-trial detainees, with the remainder being convicted inmates.

The jail administration spent the following sums out of its overall budget per prisoner/day to operate the jail for the periods designated.

| Time Period | Total Cost Per Prisoner/Day | Source |
|---|---|---|
| 12/ 1/75 through 5/31/76 | $ 6.2792 | Defendants' Ex. 9 |
| 6/ 1/76 through 11/30/76 | 6.6686 | Defendants' Ex. 10 |
| 12/ 1/76 through 5/31/77 | 8.4402 | Defendants' Ex. 11 |
| 6/30/77 through 11/30/77 | 9.3889 | Defendants' Ex. 12 |
| 12/ 1/77 through 5/31/78 | 12.4891 | Defendants' Ex. 13 |
| 6/ 1/78 through 11/30/78 | 10.1484 | Defendants' Ex. 14 |

*Plumbing*

Some of the occupied cells in the jail do not have either hot or cold running water. Other cells have only cold water. The evidence also revealed that some of the cells did not have sinks which would drain properly or did not have working toilets. Some of the solitary confinement cells and the dungeon or second tank cell lack plumbing of any kind. The solitary confinement cells now consist of the juvenile section and the sweat cells and also include the side or women's cells. Inmates in these cells do not have access to showers unless jail personnel accompany them to another area of the third floor. Nearly all of the plumbing facilities are situated in such a fashion as to be exposed to open view, including the toilet facilities of the cells normally assigned to women. The only significant exception is the shower customarily used by women prisoners.

The Mercer County Jail has not had rules, regulations, procedure, or a policy for the inspection and maintenance of the facility since at least January 1, 1977. Indeed, Sheriff Kendrick testified that to his knowledge the showers had not been repaired from 1932 until 1977. The toilets in the various cell areas frequently do not function properly and have, on occasion, flooded a cell. Similarly, the showers often stop up or have little, if any, water pressure. The stoppages of both the showers and the toilets are sometimes caused by deliberate acts of the prisoners; however, jail personnel most often do not then take appropriate steps to clear the stoppages.

Once a prisoner is locked into a cell, he or she is cut off from hot or cold running water. There are no showers in any of the cells, but on the federal, county, and city sides there are showers in the adjacent dayrooms which are unlocked at 7:00 a. m. and closed at 11:00 p. m. As noted, the juvenile section, sweat cells and side cells are without showers.

The dungeon or second tank cell is devoid of any plumbing facilities or even a drain in the floor. Inmates locked up in this cell for any appreciable amount of time must defecate or urinate on the floor of the small room. There was testimony that the dungeon had been used as recently as within one week of the trial. Fortunately, due to a recent change in the Sheriff's policy, the room is no longer to be used.

In sum, the plumbing in the Mercer County Jail is antiquated and prone to dys-

functioning by virtue of its age and design. Various of the plumbing facilities are often needlessly inoperable as a result of inattention to clogged drains, sinks and toilets and the lack of procedures for keeping the plumbing in working order. The consequent unsanitary conditions are a constant threat to the health of the inmates.

*Lighting*

The light fixtures on the third floor were installed in 1977 as part of the maintenance and repair work. These fixtures were not designed for use in a jail setting and were not protected from vandalism or other misuse. The architect in charge testified that in 1977 he was unfamiliar with light fixtures designed with security in mind although by the time of his testimony he had become familiar with security-quality fixtures. The light fixtures utilized are substandard for jail setting use and are unsafe.

In a number of cells the lights no longer function. In others, the source of light is an exposed bare bulb. Some of the inmates sleep in cells where the lights remain on throughout the night. As earlier indicated, the sources of natural light on the third floor are very limited. In some areas, notably the sweat cells, there is no access to natural light. A similar situation exists in the basement for the drunk tank.

In many areas of the jail, the artificial light is minimal and is unfit for many activities, such as reading which requires 30 foot candles as a minimum amount of light. As with the plumbing, the jail staff does not have in effect since at least January 1, 1977, any rules, regulations, procedures, policies, practice, or system for the inspection and maintenance of the light system. This deficiency is typified by the fact that the emergency lights in the jail do not work and have not worked for a considerable period of time.

The light fixtures used at the jail are inadequate and unsafe. Prisoners who often have little more to do than read are either deprived of that activity due to poor light or face the prospect of severe eye strain and resultant eye damage. This condition does not serve a valid or legitimate correctional purpose and is readily seen to be counter-productive.

*General Sanitary and Health Conditions*

The jail embodies a number of other unsanitary and unhealthful conditions and practices. The National Linen Service, during the eighteen months preceding trial, has charged modest amounts for cleaning bed clothing and towels.[5] Nevertheless, blankets, sheets, and pillowcases are not always laundered or cleaned before being reissued to another inmate. Blankets are not cleaned at least once every two months. Inmates are not always provided with sheets or blankets upon their arrival at the jail. Nor are the mattresses which are furnished to new inmates sanitized at least once a month. There was credible testimony that upon the arrival of a new inmate, a trusty or jail guard would sort through the dirty linen looking for a "cleaner" sheet to give to the new prisoner.

Even should the new inmate receive fresh bed clothing upon arrival, the bed linen is changed very irregularly. Some prisoners have gone for as long as a month or two without receiving fresh bed clothing.

The jail is deficient in other aspects relating to bedding. Besides often being filthy, the blankets that are reissued are frequently torn. Inmates expected to remain only for one night are often not given bed clothing or a mattress. In such instances, the new inmate is left to sleep on the bare metal bunk frame. Until August 1978, the jail did not provide pillows for inmates; now pillows are available but jail personnel do not always dispense them. The mattresses which are provided to the inmates are often nothing more than uncovered foam rubber. The mattresses are not cleaned after being used by one prisoner and before being given to a new arrival.

A statistical picture can be drawn concerning the bed clothing situation. The total laundry bill for the jail from January 1978 to July 1978 was $413.17. The cost of

---

**5.** The cleaning costs ran 32 cents per sheet; 16 cents per pillowcase; and 11 cents per towel.

one complete change of bed clothing at the jail is 80 cents. Thus, the number of bed changes during this period was 516. This computation ignores possible towel cleanings which would lower the total number of bed changes. The total number of prisoners needing bedding materials from January 1, 1978, to July 31, 1978, was 856. Computation shows a total of 0.603 changes of bedding material per incoming prisoner from January 1, 1978, to July 31, 1978.

The bedding problems are amplified by the filthy conditions existing in the jail generally. Besides the difficulty some of the prisoners have in reaching a shower in order to use one, other prisoners are disinclined to bathe at all and the jail does not impose any requirement that the inmates must bathe themselves. Moreover, the inmates encounter a number of obstacles in washing their clothing and bed linen. The washing machine at the jail has been out of order for several years. Those prisoners who desire to wash their clothing must do so in the sinks without soap and, often, without hot water. The clothing then must be left to dry by being hung in the dayrooms if the inmate's area has a dayroom. Some of the inmates have gone as long as two or three months without their clothes having been washed.

The bed clothing problem is made even more acute by the presence of parasitic skin conditions which occasionally plague individual inmates. The inmates testified that they have endured "crab" infestations and have gone for long periods without treatment or medication even after requesting it. James Ratliff testified that he had contracted crabs on three separate occasions but was treated only once. Similarly, there is no procedure or practice employed at the jail to delouse inmates if they are found to be infested. Medication is sometimes dispensed, but bedding materials and clothing are not changed. The significance of reissuing used and soiled bedding materials to newly arriving inmates is thus apparent.

The cleaning of the cell areas themselves is left to the inmates without supervision by the staff. The cleaning materials are dispensed by the staff and usually consist of a mop, a broom, and occasionally a bucket. Rarely is soap or disinfectant furnished. Even the mops and brooms are irregularly provided. As a result, plaintiffs' expert on jail conditions stated that the federal and county sides were filthier than any jail area he had ever seen. The same filthy conditions exist in the women's cells and the juvenile section where the court noticed a particularly offensive odor. Inmate James Martin later testified that he was once confined in the juvenile section where he discovered that feces had been smeared upon the walls in his cell which was so dirty that he would not sit down.

The cell areas are often strewn with debris. Roaches and other pests are present in plentiful quantities even though the jail administration does have a continuing contract with a private pest exterminator. Although the inmates are allowed smoking materials, they are not provided with ash trays. The inmates do not have tables upon which to eat their meals in the county side, juvenile section, side cells and sweat cells. Similarly, most sections of the jail do not have chairs or other items of furniture except for metal bunks. The federal side and city side do have long metal tables and benches in their dayrooms. The drunk tank is a single room consisting of a concrete floor and cinder block walls and is devoid of beds or other furnishings, having only the combination toilet-sink.

Upon arrival at the jail, an inmate is assigned to a designated section of the jail, but not to a particular cell unless he is intoxicated, in which case he is placed in the drunk tank.[6] Intoxicated females are

6. The court's order entered on November 5, 1980, see note 1 supra, enjoined defendants from using the drunk tank "except where an intoxicated inmate is either so sick or so violent as to necessitate the unusual circumstance of drunk tank imprisonment" and required direct visual observation of all inmates in the drunk tank at a minimum of once every ten minutes. In lieu of the drunk tank, defendants were required to place intoxicated inmates in the juvenile section of the jail. The order also enjoined defendants from segregating intoxi-

placed in a third floor side cell. There is no other attempt to assign an inmate to a particular cell. At times, as many as eight inmates have crowded into one cell in order to escape the odor and filth in other cells located in their area. In many instances the stench and filth emanates from a backed-up toilet or sink.

Inmates are not provided with lockers or similar containers to store their personal belongings while at the jail. Neither is there a system by which inmates may place their property in the custody of jail personnel and obtain a receipt. The inmates are thus left to store their belongings on an unoccupied bunk.

The inmates testified concerning numerous other problems, including the inability to obtain haircuts. They complained of the jail as being excessively hot in summer and cold in winter. The court finds this credible in view of the poor ventilation in both the basement and on the third floor. Moreover, some of the jail's windows do not close properly. One prisoner testified that during the winter it is often so cold that prisoners stay in their bunks wrapped in blankets.

Female prisoners do not have access to the most fundamental items of feminine hygiene. The plaintiffs provided evidence that persons who do not have access to showers over a period of time are more prone to skin diseases, parasitic infestations, and pararectal disease. Such problems could largely be eliminated by providing showers at least twice a week.

*Deputy Sheriffs*

The number of deputy sheriffs employed by Mercer County for use at the jail is inadequate. Every sheriff in recent years has requested more deputies; but each has had little success. Requests for additional deputies for the jail were made by former sheriff Scott, the immediate predecessor of defendant Kendrick. Each request was denied by the County Commission. Sheriff Kendrick has had a little more success in that the County Commission did permit him to hire an additional two men; but, other requests for additional deputies have been denied.[7]

The assignment of deputies to the jail and to field positions is on a seniority basis. Those deputies first entering the department begin in the jail and move to field assignments as they earn seniority. The sheriff's department employs seven deputies who are assigned to the jail. Those seven persons cover eight-hour shifts with at least one deputy on duty at all times. There is, however, no matron on call twenty-four hours a day and, of course, there are eight-hour shifts which are covered solely by male deputies. Thus, even when there are female inmates in the jail, most of the time there will only be male deputies. It is also noted that there are no blacks among the deputy sheriffs or other jail personnel, it being observed that the black population

---

cated inmates in excess of the "minimum amount of time necessary for the inmate to reach a level of sobriety whereby the inmate can be integrated with the general jail population. In no event shall the duration of an intoxicated inmate's stay in the drunk tank, the juvenile section or any combination of those areas exceed four hours."

7. The court's order entered on November 5, 1980, *see* note 1 *supra*, mandated the following improvements in staffing at the Mercer County Jail:

 1. [Defendants] [s]hall increase the staff of the Mercer County jail from 7 to at least 11 fulltime jail deputies whose sole duties shall pertain to jail related matters.

 2. [Defendants] [s]hall provide for at least one deputy to be on duty in a solely custodial function on the top floor of the jail twenty-four hours a day.

 3. [Defendants] [s]hall provide for at least one deputy to be on duty on the first floor of the jail twenty-four hours a day except on Friday nights and Saturday nights from 9:00 to 12:00 p. m., at which time two deputies shall be on duty on the first floor of the jail. The second deputy on duty on the first floor of the jail shall have as his sole responsibility the performance of the custodial duties pertaining to the care of the inmates on the first floor of the jail.

 4. [Defendants] [s]hall make every attempt to hire at least one woman in hiring the four additional deputies described in paragraph 1.

among the inmates normally ranges between 20% to 40% of all inmates.

Recruitment of jail staff in general and of minorities in particular is undertaken solely through advertisements published for civil service exams.[8] Employment of all jailers is in accordance with rules prescribed by the Deputy Sheriffs' Civil Service provisions of the West Virginia Code.

There is no testing of applicants for the deputy positions beyond that required by the Civil Service System. Indeed, the deputies receive no training other than that provided by the State Police Program and the very limited training derived from within the organization of the Sheriff's Department. There is no formal course specifically in corrections and jail matters. Nor is there an annual refresher course in corrections matters for the deputies. The deputies do not receive any training in human relations or the special problems encountered in an inmate population. Occasional instruction in law enforcement matters as opposed to corrections training is furnished the deputies. Instruction at the State Police Academy's Training Program in Law Enforcement was not provided to any deputy during defendant Kendrick's tenure in office until March 1979 when a deputy was sent to the program.

As a result of these deficiencies, the staffing at the jail is inadequate. The deputy on duty at the jail is located in the control room in the basement of the courthouse. No deputy or other security officer is stationed on the main jail floor even when more than one jailer is on duty. The jailer is responsible for inspecting the third floor jail; but, the lack of jailers prevents inspection of every part of the jail even as little as once every two hours. The only means of communication between the control room and the third floor jail is by

means of an intercom located near the main elevator and a telephone located in the third floor attorney-client interview room which is also near the main elevator. The door connecting the locations of those devices with the main part of the jail (other than the trusty side) is usually locked from 4:00 p. m. to 8:00 a. m. That same door connects the trusty side with the rest of the jail. The inmates are locked within their specific areas and do not have direct access to either communications device.

As would be expected in this setting, the relations between the deputies and the inmates are often poor. Both jail personnel and the inmates frequently speak to each other in abusive language and the inmates are often threatened in various ways by the deputies.

*Fire Detection and Prevention*

The inadequate number of deputies to serve as jailers manifests itself in a variety of ways which number among them the lack of satisfactory fire prevention, detection and evacuation measures. As already observed, a jailer is not stationed on the third floor. Thus, the importance of indirect methods of fire detection becomes apparent.

The jail, however, lacks a fire alarm system. There are no fire or smoke detectors located in the jail areas of the courthouse. Nor is there a sprinkler system in the jail. The hand held fire extinguishers which are present in the jail are not regularly tested. As noted, the emergency lights at the jail do not function so that in the event of an electrical power outage, the third floor jail area is plunged into darkness.

The means of egress from the third floor have already been covered. Notice should be taken again that the sole staircase from the third floor is usually barred by a locked

---

8. The last such advertisement for deputy sheriffs positions prior to trial was a classified ad in the Bluefield Daily Telegraph which ran for nine days beginning on July 27, 1977, reading:

NOTICE The Mercer County Civil Service Commission has announced that it will be taking applications for deputy sheriffs through August 15, 1977, for an examination

to be given September 14, 1977 at 9:30 a. m. to be held in Ball Room of the Memorial Building, Princeton, West Virginia. Application blanks and other information may be obtained at the Office of Wilson D. Harvey, County Clerk, Courthouse, Princeton, West Virginia. Wilson D. Harvey, Clerk, Mercer County Civil Service Commission.

door at the third floor level. In the event of a wide-spread fire, the two elevators may not be safely available. Moreover, elevators constitute a notoriously poor fire escape choice in that their controls tend to malfunction when exposed to abnormally high temperatures, and both smoke and fire tend to seek out and rise up the elevator shaft.

The jail administration has not adopted rules or an evacuation plan for the jail in case of fire. There is no public address system at the jail to alert the inmates of the action to be taken in the event of fire. Since at least January 1, 1977, there have not been any rules, regulations, policies or procedures of any kind at the jail to direct, control, regulate, or guide the jail administration or personnel with respect to fire emergencies and the evacuation of inmates. Similarly, there were no fire drills conducted at the jail during the two years prior to trial. The jail administration has not provided face masks for use in the event of fire and smoke by either jail personnel or inmates. Testimony was presented that in 1976 an inmate set fire to her mattress and then threw herself upon the flames, causing her eventual death from the burns she received. Deputy Meadows tried to rescue the inmate but was overcome by smoke since he was not wearing a face mask.

As already indicated, an inmate must pass through several locked doors to get from his cell to the basement of the jail or even to the second floor of the courthouse. There is, however, no master key to all the locks of those doors. Deputy Catron testified that six keys are necessary to open all third floor cell areas in order to get the inmates off the third floor in the event that all the doors are locked. Sheriff Kendrick stated that it would take twenty minutes to evacuate the inmates. Former Deputy White testified that during one actual fire at the jail, twenty to twenty-five minutes were expended in evacuating the jail. When finally removed from the third floor, the inmates are usually placed in the kitchen area of the basement. The kitchen area has only one means of ingress and egress and is located in a remote part of the base-

ment. To exit from the kitchen, a person must pass by both the control room and drunk tank and then move past the mouth of an open stairwell and the door to the juvenile area. From that point, one passes through the garage area and then out of the building. The possibility of being trapped anywhere along this lengthy path is apparent. This is especially important inasmuch as the boiler room and a fuel storage area are located immediately behind the kitchen wall.

In addition to the 1976 death by fire of a female inmate, various current and former inmates testified respecting other jail fires. As an example, Ivan Grindle recalled one fire at night while he was incarcerated on the third floor. He stated that the jailer on that occasion had not locked the county side inmates in their cells, leaving them free to enter their dayroom. Grindle awoke to a smoke-filled cell, but was able to obtain an implement to break the windows facing the county side in order to get some air. Normally, if he had been locked within his cell, he would have been unable to reach the windows. There was other testimony of fires deliberately set by the inmates. Although the inmates are permitted to smoke in their cells, they are not provided with ash trays or similar containers. When added to the combustibility of the two types of mattresses used at the jail, a further fire hazard is thereby created. This becomes especially serious when it is considered that the mattresses, when burning, emit toxic fumes.

What little freedom the trusties have to detect and extinguish fires is severely limited when their steel door is closed at 4:00 p. m. each day. That door remains locked until 8:00 a. m. the next morning.

In view of the inadequate staffing of the jail, combined with the total absence of any plan to detect fire and sound an alarm, the jail inmates are being needlessly subjected to preventable danger of death and injury by fire. Considerable testimony was received to the effect that the only way the inmates could give an alarm was by bang-

ing on the walls or the steel bars and by shouting. The time needed for the deputy in the basement control room to take note of the noise and to respond to it, when added to the twenty minutes required to evacuate the inmates from the jail, places the very lives of the inmates in jeopardy without justifiable reason on the part of the jail administration. The calamity waiting to take place at the Mercer County Jail has been played out elsewhere across the nation. It appears to be only a matter of time before the inmates are called upon to needlessly risk or even surrender their lives when confronted with fire.

These problems are not new to the jail. Neither have they escaped the attention of the jail administration. In July 1976, August 1977, and August 1978, the West Virginia Fire Marshal's Office inspected the jail. Fire Safety Inspector Reports were prepared to indicate the areas in which the jail was in violation of the state laws relating to fire safety. The 1978 report recites the following state law violations: the absence of fire extinguishers; the existence of combustible materials in prohibited areas such as paint in the third floor closets; the lack of face masks to prevent inhalation of smoke; the absence of properly functioning emergency lights; the extensive use of extension cords; defective electrical wiring; the lack of an approved fire alarm system; the absence of fire doors; the existence of open stairways; and, the lack of exit signs and an alternative means of escape from all areas of the jail. In all, the 1978 report lists sixteen separate violations, ten of which were shown in the 1977 report and six of which were shown in the 1976 report.[9]

The standards used by the West Virginia Fire Marshal's Office in fire safety enforcement are based upon state law and nationally observed standards. The County Commission has contracted with architect G. Cameron Hunter for the purpose of making improvements called for by the Fire Marshal's Report following action by the Fire Marshal on the Commission's plan.

Besides the fire marshal's reports, the jail administrators have had the benefit of a report filed in 1976 by the 1976 Jail Committee which was appointed by Chief Judge Howard Jarrett of the Ninth Judicial Circuit of West Virginia. The report specifically noted the lack of emergency lights and pointed out the inherent danger of not having a deputy stationed on the third floor of the jail. Neither condition was rectified.

In summation, the court finds that inmates at the Mercer County Jail are being subjected to unreasonable and unnecessary risks of injury and death by fire.

*Sufficiency of Housing and Supervision*

The preceding discussion concerning the number of available deputies to serve as jailers is pertinent here. The critical understaffing of the jail makes assurance of security within the jail and safety of the inmates a virtual impossibility. As already noted, there are only seven full-time deputies available for jail duty.[10] Jailer assignments are such that two deputies are assigned on the midnight to 8:00 a. m. shift, but usually only one is actually present. The 8:00 a. m. to 4:00 p. m. shift has two deputies on duty and the 4:00 p. m. to midnight shift employs but one deputy.

It has been noted that jail personnel do not inspect all parts of the jail even as infrequently as once every two hours. Nor do they observe every inmate-occupied area and every inmate at least once every half hour. Even during inspection tours, not every inmate is observed.[11] A deputy can-

---

9. The court takes notice pursuant to Rule 201 of the Federal Rules of Evidence that on July 7, 1981, and again on February 4, 1981, the West Virginia Fire Marshal's Office issued Fire Inspection Reports on the Mercer County Jail, listing some ten separate violations, most of which were previously cited in the prior reports.

10. As discussed more fully in note 7, *supra*, the court's order entered on November 5, 1980, required defendants to increase the jail's staff to eleven full-time deputies.

11. The court's November 5, 1980, order, *see* note 1 *supra*, required that defendants:

18. Shall provide for direct visual observation and surveillance of all inmates in seg-

not see into the cells on the county, city, federal, and trusty sides from the main corridors. Rather, the deputy must enter either the cell block area or the guards' corridor located between the dayroom and the exterior wall. Both of these avenues require passage through locked doors. The deputy seldom utilizes either route. Inmates in the juvenile section of the jail frequently are not observed for as long as seven and one-half hours. Persons in the basement drunk tank cannot be seen from the control room.

As a result of an insufficient number of jailers, the lack of written standards or policies by the jail administration concerning jail inspection and the inadequate communication between the jail floors, the security of the jail and the safety of the inmates is put into serious jeopardy. Testimony was presented by past and present inmates, as well as by deputies, that violence and fear of violence are not strangers to the jail. Instances of homosexual assault, beatings, fights, and suicide attempts were reported. Notice has previously been taken of two suicides at the jail occurring on April 15, 1980, and September 28, 1980. *See* note 1, *supra.*

Plaintiffs' expert testified that two deputies should be stationed on the third floor of the jail at all times. Even two deputies, however, would have a difficult time managing an evacuation in an emergency. The expert further testified that besides the two third floor deputies, there should be three deputies on duty in the basement during the day and evening shifts and two deputies on duty during the night shift. These figures were arrived at on the basis of the expert's opinion that due to the poor design of the jail, a ratio of one jailer to every five inmates was required to maintain jail security and inmate safety.

The expert also concluded that the maximum capacity of the jail, on the basis of what he believed to be minimum national standards, is twenty-four inmates. It is, however, not uncommon for thirty or more inmates to be incarcerated in the jail at any one time. On occasion, the number of inmates is substantially higher. The inmates are assigned to either the federal, county, or city sides but not to a particular cell. As a result, the inmates space themselves among the cells and, on occasion, four people will live in one of the eight-bed cells. Notice has already been taken of a blocked toilet which caused eight inmates to reside in one cell measuring ninety-six square feet. Plaintiffs' expert was of the opinion that a minimum of sixty square feet was necessary for each inmate.

The juvenile section located in the basement of the courthouse has four cells, each one measuring 96 square feet. On occasions lasting from one to five hours, there have been as many as fifteen persons housed in this area.[12]

Plaintiffs' expert also testified concerning the use of the main drunk tank.[13] The jail administration's practice is to place newly-arrived intoxicated males in the drunk tank. Testimony by James Ratliff and Charles Goode indicated that as many as fourteen to eighteen persons have been placed in the drunk tank at one time. The average for a Friday or Saturday night is five to six men. The expert's opinion was that the practice of placing an intoxicated man into a room like the jail's drunk tank violated minimum national standards for

regation, for whatever reason, at a minimum of once every ten minutes.

. . . .

21. Shall provide for direct visual surveillance and observation of those inmates kept in nonsegregation situations by a deputy on duty no less frequently than once every 30 minutes. Visual checks of the jail's non-segregated population shall include, but not necessarily be limited to, a view from the catwalks along the sides of the city side, county side, federal side and trusty side of the jail whenever those areas are occupied by jail inmates; and a view through the glass window in the door of each side cell whenever such cells are occupied by an inmate.

12. As previously noted, *see* note 6, *supra,* the court's November 5, 1980, order provided that the juvenile cells be used as the cells of first priority for the housing of intoxicated inmates as well as for segregated inmates.

13. *See* note 6 *supra.*

adult detention facilities. He further testified that with an adequate jail staff, intoxicated persons could be put directly into a furnished cell rather than into a totally barren room.

The jail administration has no policy requiring a permanent record of the areas to which an inmate is assigned. Rather, a card file is kept in the jail's control room. A card bearing the inmate's name is simply moved from one division of the card file to another so as to reflect the inmate's present location in the jail. No record is retained which survives the prisoner's removal from one part of the jail to another. There is also no record which survives a prisoner's release from the jail. Inasmuch as no permanent record exists, a potential safeguard against the infliction of arbitrary punishment is lacking.

There is no policy which requires an inmate's presence when the inmate's cell is searched. There is no policy requiring staff supervision of inmates while they are engaged in cleaning the jail on the infrequent occasions they are issued cleaning equipment.

Other evidence of laxity in supervision abounds. Testimony was presented that in 1974 an intoxicated inmate was placed in the juvenile section of the jail by himself. He was found dead two or three days later of unknown causes. The witness testified that the deceased inmate had lash marks on his back and that his ribs were separated from his sternum. Reference has already been made to the inmate who burned herself so severely on her flaming mattress that she subsequently died. Other testimony was presented that inmates occasionally obtained access to the control room and went through the desk drawers which contained firearms and prescription drugs. The same witness testified that on one occasion he obtained keys to the jail and unlocked some prisoners. Another inmate testified that an hour elapsed before the jailer could be obtained to attend an inmate who had attempted suicide.

It is apparent that, due primarily to insufficient staffing, jail supervision is so inadequate as to constitute a genuine threat to the lives and safety of the jail inmates.

*Classification*

There is no written classification system at the jail for the assignment of particular inmates to given sections of the jail. Neither is there an unwritten classification system except along the lines of sex, age, and state of intoxication. As already observed, the jail administration has followed a general policy of placing intoxicated males in the basement drunk tank. Female inmates are placed in one of the side cells. Normally, juveniles are not housed at the jail unless a court so orders. When juveniles are housed at the jail, they are placed in either the juvenile section located in the basement or in a side cell.

Jail inmates are not confined pursuant to a classification system which separates first offenders from repeaters, pre-trial detainees from convicted persons, or inmates convicted of violent crimes from inmates convicted of nonviolent crimes. Occasional distinctions are made on the basis of a showing of aberrant behavior or the presence of psychological problems of an individual inmate. There is no screening process employed to accomplish this and the distinction is not always made.

Just as there has been no general policy of initial classification, neither has there been a policy at the jail which requires a review of the status of a person placed in segregation at designated times and with designated criteria for review.[14]

14. The court's November 5, 1980, order, *see* note 1 *supra*, provided that each segregated inmate "be examined by a duly and permanently licensed psychiatrist or psychologist . . . as soon as practicable, but in no event more than 48 hours after the onset of such segregation." The order further required that inmates segregated as a disciplinary measure or for their own safety or the safety of others be provided regular psychologic reviews and, when deemed appropriate by the doctor, regular counselling. The November 5th order also provided that the following cells were to be used for segregated inmates on a priority basis:

 (a) Sweat cells will be used only when all juvenile cells and the so-called women's cells

## Rules and Regulations

There have been no written rules or regulations governing the operation of the jail or the conduct of jail personnel promulgated by the jail administration. Neither have there been written rules and regulations defining and protecting the rights and privileges of the jail inmates except that visitation periods were prescribed in writing as of March 14, 1980, for Wednesday and Sunday between the hours of 1:00 p. m. and 3:00 p. m. for an inmate's immediate family only. There are no written rules concerning opening and reading either outgoing or incoming mail for the inmates.

Certain acts of the inmates which are prohibited by the jail administration were first listed in writing as of March 14, 1980, together with a general statement of the applicable penalties. Whether a violation has occurred is determined at the discretion of a deputy.

## Imposition of Punishment

There are no written or unwritten rules or regulations providing for prior notice, an opportunity to be heard, or an opportunity to present evidence before a disinterested impartial hearing officer or panel prior to the imposition of disciplinary action upon an inmate, except that an inmate's attorney may be notified on an informal basis that an inmate's visitation privileges or store privileges are to be revoked or other action is to be taken. When the Sheriff or a deputy learns that a prisoner is accused of having committed an infraction of the informal jail rules, the official makes a decision on the spot as to whether or not a sanction is to be imposed. This is the sole means employed in deciding whether or not a rule has been violated and what punishment to inflict.

The only grievance procedure available to an inmate is to orally express a grievance to the Sheriff or a deputy. Deputies are not instructed concerning the rights an inmate

are already occupied with segregated inmates.
(b) Juvenile cells will be used only when the so-called women's cells are already occupied with segregated inmates.

retains while incarcerated. No records are kept pertaining to disciplinary action taken against inmates.

Punishment at the jail takes various forms and includes such things as putting an inmate in a side cell or sweat cell, removing an inmate from one main area to another, depriving a trusty of his status, confiscating reading material, denial of visitation privileges either individually or for whole groups of inmates, the taking away of previously earned good time, and, until recently, the placing of an inmate in the third floor dungeon. Prisoners are not always informed of the reasons for which they are being punished.

## Administrative Segregation

Administrative segregation of inmates is customarily used as a means of punishment for serious misbehavior by prisoners. Until March 14, 1980, there have not been any rules, regulations, procedures, or policies by the jail administration controlling or regulating the imposition of Administrative segregation. As of March 14, 1980, written rules provide that assault by an inmate on a deputy or another inmate will result in immediate administrative segregation for six months, with lesser violations resulting in 24-hour lockup for a first offense, 48-hour lockup for a second offense and six months lockup for a third offense. A permanent record is not kept of an inmate's placement in administrative segregation other than the card file previously noted.

Administrative segregation at the jail means being placed into the sweat cells, alone in a side cell, or alone in a juvenile cell. Formerly, an inmate could also be placed into the third floor tank or dungeon which has been described earlier. Confinement in the sweat cell area may mean being locked into a particular cell or being placed into the entire area with freedom to move between cells. Confinement in a particular sweat cell means being without access to

(c) The so-called women's cells will be the segregation cells of first priority.

hot water, a shower, towels, or a chair. The sweat cell area is wholly located within an inner section of the building and is without access to natural light inasmuch as the skylights have been painted. Since the electrical lighting is inoperative in the sweat cell area, the only light is that received from the illuminated corridors outside the area. There is an internal door within the sweat cell area which when locked bars the inmates from access to the shower even though the inmate is not locked within a particular cell. Inmates placed in administrative segregation are not differentiated on the basis of their status as pre-trial detainees or as convicted persons.

## Clothing

Jail inmates are not provided with clothing by the jail administration. The inmates must furnish all their own clothing. The jail administration since at least January 1, 1977, has not had rules, regulations, or policies concerning the storage of inmate clothing or other belongings. Inmates who arrive at the jail with only the clothes they are wearing must continue to wear those clothes until they are supplied with clean clothing by family or friends outside the jail.

Inmates are not required to wash their clothes nor are they helped by the jail administration in doing so. The washing machine and dryer at the jail have been out of order since before defendant Kendrick took office as Sheriff. Inmates are relegated to washing their clothes in a sink most often without aid of soap and often without hot water. If a prisoner wishes to wash clothes by hand in a sink and has no extra clothing, the prisoner must remain undressed while washing and drying his or her clothing. To dry clothes, inmates must hang their wet clothes in the living area of their section such as a dayroom or, in the case of a side cell or juvenile cell, in the cell itself.

## Toilet Articles

The jail administration does not provide inmates with any of several types of toilet articles such as deodorant, razors, combs, toothbrushes, toothpaste or mirrors, nor are inmates furnished with the services of a barber. Prisoners are not given individual bars of soap for each prisoner's exclusive use. Towels often are not furnished. Toilet paper is issued at the request of an inmate. Such a request, however, is not always promptly complied with by jail personnel. Prisoners have gone for as long as three or four days without toilet paper. The lack of necessary toilet articles enhances the likelihood of disease and infection among the jail population.

## Exercise

There is no program or equipment available at the jail for either indoor or outdoor exercise by the inmates. Nor is there an available area either inside the jail or in the immediate vicinity of the courthouse of sufficient size for the inmates to engage in recreation or exercise such as running and jumping. Plaintiffs' expert testified that an area the size of one-half of a basketball court was required to meet minimum national standards for indoor exercise.

Since at least January 1, 1977, the jail administration has not promulgated rules, regulations, or policies for inmate recreational or exercise activities. Plaintiffs presented credible evidence that vigorous exercise is needed to sustain one's physical well-being and that the lack of such exercise over a sustained period of time will cause serious bodily harm such as loss of muscle and bone mass due to negative nitrogen balance.

## Medical and Dental

Upon their arrival at the jail, inmates are not routinely examined by a physician or other medically trained person and they are not questioned concerning their medical history. Other than visual observation by jail personnel, prisoners are not tested for drug addiction. On occasion, inmates suffer alcohol withdrawal without the assistance and supervision of medical personnel, thereby potentially exposing them to a serious medical crisis. The jail administration has not established a procedure for the detoxification or treatment of inmates suffering from alcoholism or drug addiction other than the denial to the inmate of alcohol or the ad-

dicting drug. There does exist at the jail an Alcoholics Anonymous program. Otherwise, alcoholics, if not intoxicated, are treated no differently than the rest of the inmate population.

The jail does not have medical supplies or an equipped medical examining room nor do medical personnel visit the jail. Consequently, there are no regular sick calls taken at the jail. The inmates are not provided with preventive dental care.

The jail administration has not arranged for the care of prisoners by psychiatrists, psychologists, or other similarly trained persons. If the jail personnel determine that a prisoner is in need of mental health care, they can make suitable arrangements with a mental health professional. All inmate requests for any type of medical attention must be cleared and approved by the Sheriff or a deputy prior to rendition of medical services except in those instances where the treatment is requested by a family member or an attorney. No records are maintained by the jail administration of the receipt of any type of medical treatment by the jail inmates with the exception of bills received for the treatment rendered and for medications administered to the inmates.

Prescription medications are dispensed on a dosage basis to the inmates either by jail personnel or, occasionally, by other prisoners. The forms used to record the dispensing of medication to the prisoners have two signature boxes for each such occasion: one for the signature of the person dispensing the medication and the other for the inmate recipient to acknowledge receipt. The inmate recipient, however, is not required to sign the form. Additionally, there is no requirement by the jail administration to insure that the inmate immediately consumes the medication. Moreover, inmates frequently do not receive their prescribed medications as directed by the physician, nor do they always receive suggested follow-up diagnostic services.

Since at least January 1, 1977, there have not been any rules, regulations, or policies promulgated by the jail administration to control the delivery of health care services or to record that delivery other than the retention of invoices and the medication dispensing form. No record is kept by the jail administration of any injury to a prisoner while confined at the jail.

Should an inmate require hospitalization, the inmate is transported by ambulance to the Princeton Community Hospital located in Princeton, West Virginia. The ambulance is provided by Appalachian Operation Health (OH9) for a fee of approximately $35.00 per one-way trip which is paid by the Mercer County Commission.

Psychological testing and evaluations for mental health purposes are performed only when an inmate so requests and only after either the Sheriff or a deputy, neither of whom has any special education in either mental or physical health, has approved the request. The evaluations which are made at the jail are not recorded. Prisoners who display serious mental or emotional problems are frequently cast into the general population of the jail without any special care. Once such prisoners are so deposited, they are often subjected to abuse from other inmates.

Due to the insufficient number of jailers employed by the defendants and the lack of communication between the different areas of the jail, personnel have been slow to react to specific instances of illnesses or medical emergencies among the prisoners. Testimony was presented by the plaintiffs of instances where the prisoners banged on the walls and shouted for periods in excess of a half hour or more before a deputy would come to the third floor to investigate the situation. In view of the additional time needed to obtain an ambulance and transport an ill inmate to a hospital, an inmate's life could be endangered by the prolonged reaction period. A misperception by untrained jail personnel of an inmate's true condition could also easily lead to serious harm or even death.

*Nutrition*

Since at least January 1, 1977, the jail administration has not promulgated any rules, regulations, or policies concerning the

provision of food to the jail inmates. The jail administration does not employ a dietician or nutritionist; but, the cook has begun to consult with a dietician from the Princeton Community Hospital in the preparation of menus since the institution of this suit.

Food service at the jail is under the control of the Mercer County Commission and is supervised by the Sheriff. A cook is employed by the Commission and has individual responsibility for the choice of menus and food purchases. Certain trusties are designated to assist the cook in the kitchen and in food service. The designated trusties usually do not have food handling licenses.

Service of food is conducted by the cook with the assistance of trusties. The food is taken to the main jail area on a cart and the individual trays are then delivered to the dayroom areas. The food carts do not have working heating units to keep the food warm. In the various areas of the jail which do not have access to a dayroom area, the trays are taken to the individual cells. This system is employed three times daily for the three main meals of the day; however, coffee and other items are also served three times a day between the main meals.

Prior to the institution of this action, the jail inmates were rarely provided with fresh fruit. Moreover, the inmates are not presently given second helpings of food.

The Mercer County Commission, in furnishing the food for the operation of the food service at the jail, expended the following sums per prisoner per day for the time periods as designated below:

| Time Period | Food Cost Per Prisoner Per Day |
| --- | --- |
| 12/ 1/75 to 5/31/76 | $ 0.9611 |
| 6/ 1/76 to 11/30/76 | $ 1.0920 |
| 12/ 1/76 to 5/31/77 | $ 1.2165 |
| 6/30/77 to 11/30/77 | $ 0.9038 |
| 12/ 1/77 to 5/31/78 | $ 1.5271 |
| 6/ 1/78 to 11/30/78 | $ 1.7382 |

It is noted that this calculation does not take account of the fact that jail personnel, deputies, and occasionally other persons consume some of the food purchased for the prisoners.

The jail kitchen is inspected on a regular basis by the Mercer County Health Department and routinely passes inspection. Nevertheless, a number of deficiencies in the food service operation are apparent. Trusties, who usually assist the cook in the preparation and handling of food, do not receive proper training to perform their duties, and are not given a medical examination. When the cook is absent from the jail, the trusties are left to prepare and serve the food themselves. Members of the kitchen staff smoke cigarettes in the kitchen while food is being prepared; additionally, hands are frequently not washed, hair nets or caps are not worn, and coverall uniforms are not worn by the food handlers. No clean-up schedule exists for the kitchen.

Plaintiffs' expert, Florence Peterson, found that food is not always properly stored at the jail. She testified that she found foods in the jail refrigerator that had been there so long that mold was growing on them. Other food items were stored without being covered, thereby losing nutritional value.

The delivery of food to the inmates is not carried out in a sanitary fashion in all instances. Food in the juvenile section is served to the inmates by sliding it under the bars along a filthy floor. Inmates are not given clean eating utensils with each meal; rather, they use the same utensils at each meal without any provision for cleaning other than by use of the sinks in the cell areas. The equipment used in food preparation and delivery is not cleaned after each use.

The regular cook at the jail is skilled in the cooking of food but is not properly trained in the provision of a nutritional menu. The jail does not have an adequate system to monitor portion control. A slotted tray upon which food is placed is used without measurement of quantity. No record of food served, portion size or caloric content is made and maintained. Neither does the jail staff utilize menus prepared sufficiently in advance to allow for proper planning of meal preparation.

The kitchen staff routinely prepares and serves similar foods repeatedly. No special diets are available at the jail for inmates with medical problems. Jail food is generally overcooked, thereby depriving the food of certain of its nutrients.

Plaintiffs' expert provided credible evidence that the Recommended Dietary Allowances of the National Academy of Sciences (RDA) constitute minimum standards for food intake and nutrition. While the food provided the inmates is of sufficient caloric and nutritive value for short-term prisoners, inmates incarcerated at the jail for periods in excess of about four months begin to be seriously deprived of proper nutrition. Long term inmates have occasionally lost significant amounts of weight due to a combination of caloric inadequacy and blandness. The lack of second helpings of food also contributes to weight loss. Moreover, no procedure is used to make certain that all inmates receive meals.

Prisoners do not receive sufficient amounts of vitamins D and C in their food. This problem is exacerbated since the inmates do not have access to direct sunlight as an alternative source of Vitamin D. Among the more specific complaints of the prisoners was that of James Caldwell who became exceedingly pale during his 18 months of incarceration at the jail. The jail food is also deficient in calcium and riboflavin. All of these deficiencies can, over an extended period of time, lead to health problems such as bleeding gums, tooth decay, bone deterioration, fatigue, depression, and diarrhea. Much of the negative impact of the food provided by the jail administration is enhanced by the sedentary nature of the inmates' lives in the jail.

In summation, the procedures used at the jail to prepare and serve food are deficient and create a hazard to the health of the inmates. For long term inmates, the inadequacy of the jail food constitutes a health hazard which is unnecessarily harsh and constitutes additional punishment beyond mere confinement. In general terms, the lack of stringent sanitary food controls is an unnecessary hazard to the health of all inmates.

*Mail*

Since at least January 1, 1977, there have not been any rules, regulations, or policies at the jail to guide jail personnel in the handling and inspection of mail addressed to inmates or of mail sent by inmates. There is no difference in the way the mail of pre-trial detainees is treated from that of convicted inmates. The jail administration has not promulgated or implemented a policy whereby incoming mail is read or inspected only in the presence of the recipient inmate.

Jail inmates, whether indigent or otherwise, are not provided by the jail administration with any of the materials needed for writing and posting of mail. The inmates are permitted to receive and send mail on a regular basis. Arriving mail is delivered to the inmates by the cook and his staff along with the meals. Outgoing mail is to be given to the trusties or jail personnel and is generally deposited on a daily basis in a post office receptacle near the courthouse. Occasionally, mail will not be posted by jail personnel within twenty-four (24) hours.

Incoming non-legal mail addressed to the inmates is from time to time opened by jail personnel without the addressee inmate being present and is sometimes read, all without authorization from the sender or the inmate. The same practice occurs less frequently with letters from an inmate's attorney. The defendants have at their disposal as a possible guide for their use in handling inmate mail Public Directive DOC–PD 451 of the West Virginia State Correctional System which sets forth the mailing rights and privileges given to inmates of that system.

On two related matters, the jail inmates are not provided with local newspapers on a regular basis, and some inmates occasionally receive packages left at the jail by their families or friends but which are missing some of their contents when received by the inmate for whom intended.

While the receipt or sending of mail by inmates does constitute a security problem

for the jail administration, the haphazard and arbitrary manner in which the mail is handled by jail personnel is an inappropriate response to that problem.

*Telephones*

The only telephone on the third floor of the courthouse is in the attorney-client interview room. Neither pre-trial detainees nor convicted inmates have access to a telephone except by request to a trusty, the jail chaplain, or jail personnel that they be taken to a telephone or that a call be made for them. To reach a telephone, an inmate must be unlocked from the cell area and escorted by a deputy. Due to the shortage of jail deputies, it is very difficult for an inmate to obtain prompt access to a telephone. Jail personnel are seriously hampered by a personnel shortage which often leads to a negative attitude on their part when called upon to assist an inmate. At times, they are simply too shorthanded to take the time to escort an inmate to a telephone. This problem also arises if an inmate wishes to contact the inmate's attorney.

Since at least January 1, 1977, the jail administration has not promulgated or implemented any rules, regulations, or policies at the jail to guide jail personnel on the use of telephones by the inmates. Moreover, there is no difference in the telephone privileges of convicted inmates and pre-trial detainees. Prisoners never receive telephone calls at the jail except, perhaps, in the most extreme emergencies. Finally, upon arrival at the jail, new inmates, especially highly intoxicated ones, are not always allowed to make a telephone call.

*Visitation*

An inmate may see members of the immediate family for fifteen (15) minutes twice a week on Sunday and Wednesday from 1:00 p. m. to 3:00 p. m., with a few occasional exceptions.[15] Those exceptions include instances where the visitors have traveled long distances or where a death in the family has occurred. As in all other jail practices, pre-trial detainees and convicted

inmates are treated in the same manner with respect to visitation.

Upon arrival at the jail, a visitor must sign in at the control room in the basement of the courthouse. Children under the age of twelve (12) years are generally not permitted to visit inmates at the jail. Visitors may leave packages for a prisoner on visitation days. The packages are subject to a security inspection by jail personnel.

Visitation at the jail is arranged so that there is no physical contact allowed between the prisoner and the visitor except in an emergency situation such as a death in the inmate's family. Trusties are allowed some contact visitation.

The means of communication during a visit is through a metal wall containing a small glass plate (protected by bars) for visual purposes and a perforated metal plate just below the glass through which the parties talk. The inmate stands in one end of a dayroom which borders on a corridor. The visitor stands in the corridor. Between them is the solid metal wall on which there are several such communication devices. The visitor and inmate view each other as best they can through the glass plate, which is rarely cleaned, and virtually shout to each other through the tiny holes of the perforated metal plate in order to be heard. Hearing is always difficult because of the echos which reverberate throughout this steel and concrete chamber. Communication is especially hampered if other inmates are receiving visitors at the same time inasmuch as these communication devices are less than three feet apart. Consequently, visits do not involve any degree of privacy. One of plaintiffs' expert witnesses described visitation at the Mercer County Jail as being nearly worse than no visitation at all.

Visitation is often denied to inmates as a form of punishment. This includes pre-trial detainees who have committed some infraction while in jail. Whole groups of inmates have been denied visitation rights as a means of punishment. In one instance, a

---

**15.** Conferences with attorneys are discussed *infra* at 1279.

group of prisoners on the federal side were apprehended on May 6, 1978, attempting to escape. All of the federal side prisoners were then moved to the county side and, without undertaking to determine who among them were involved in the attempted escape, were denied visitation privileges for two weeks. There are no provisions for notice, an opportunity to be heard, or an opportunity to present evidence before a disinterested hearing officer or panel prior to the denial of an inmate's visitation rights except that an inmate's attorney may be notified on an informal basis that an inmate's visitation privileges are to be revoked.

In summary, the visitation practices employed by the jail administration subject inmates and visitors to unnecessary hardships and needlessly discourage visitors from coming to the jail.

*Reading and Related Materials*

Prior to the institution of this suit, the jail administration did not provide the inmates with newspapers, magazines, or books. The jail did not maintain a library of any sort. In this connection, during the third week of September 1978, plaintiffs' expert Kenneth Ricci toured the jail with the Sheriff. In the course of that tour, Mr. Ricci did not discover a library of any kind in the jail.

Since the institution of this suit, a chaplain has begun work at the jail and he has instituted a number of activities including a library, an alcoholics anonymous program, a General Equivalency Diploma (GED) program, a communications program for prisoners with their families and attorneys, private pastoral counseling, religious films, a number of religious programs and, for at least one inmate, a work-release program coordinated with the directions of the sentencing court.

Almost all of the library books and magazines advocate or pertain to the Christian religion. The chaplain actively screens all books and magazines that come to the jail for the library to determine whether he considers them to be of poor value or to contain violence. If so, he does not allow them in the library. Prisoners are permitted a variety of game activities such as cards, checkers and bingo. The attorney-client room (which doubles as a trusties' area) has a television set. Prisoners are permitted to obtain from their own resources a radio. The general inmate population does not have access to a television set.

In order to obtain a local newspaper, an inmate must enlist the services of a trusty who can leave the jail and purchase the newspaper. Sometimes, the trusty must be given a gratuity for his services.

After the attempted escape on May 6, 1978, all of the reading material and game activity material of prisoners on the federal side was confiscated and most of it destroyed. Subsequently for a brief period of time, prisoners were not allowed to read newspapers.

*Vocational, Educational, Work, and Other Rehabilitation Programs*

Despite the presence of a vocational training school within one-half mile of the jail, the jail administration has not devised vocational training programs or work programs for the inmates except for certain trusties and specified other inmates whom the sentencing court directs be permitted to engage in outside work. Judge William O. Bivens, Jr., the Circuit Judge for Mercer County who handles most criminal matters for the court, will order an inmate's participation in a work-release program when he believes such a program is merited upon his appraisal of a sentenced inmate's circumstances. On occasion, a federal judge has directed that a federal prisoner sentenced in the Bluefield Division of this court be committed to the Mercer County Jail in order that the prisoner might be released on week days for gainful employment in the Princeton area. Otherwise, the jail is no longer used to house federal prisoners on a routine basis.

Such attempts at vocational or educational programs as have been tried at the jail were all initiated during the term of office of Sheriff Kendrick. Generally speaking,

however, the prisoners do not have access to any type of vocational training program, rehabilitation program or recreational facilities, nor to employment in a public work project. The jail does not provide for a social services program for the inmates and does not have any provisions for meeting the employment needs of the inmates in that no effort is made to determine the skills possessed by an inmate or to assign work in such a way as to utilize those skills. Judge Bivens testified that he would cooperate in an effort to make a work-release program successful should the jail institute a systematic screening program to determine work-release eligibility. The jail administration, however, has not undertaken to contact the vocational training school nearby to explore cooperation possibilities nor have meaningful steps in this regard otherwise been taken.

The jail administration does not provide the general inmate with any work at the jail other than the earlier described cleaning chores. Trusties are given employment in facility maintenance and operation. There are no recreational programs at the jail furnished by the jail administration. As already observed, prisoners other than trusties do not have access to a television set at the jail.

In short, insofar as programs provided by the jail administration are concerned, idleness on the part of the inmates is the central fact of existence. The jail functions virtually without any recreational or leisure activities for the inmates.

Such programs as do exist at the jail are made available by the jail chaplain. Chaplain Chancellor is employed by the Good News Mission, International Headquarters, 1036 South Highland Street, Arlington, Virginia, and is assigned to the Mercer County Juvenile Detention Center, the Bluefield City Jail, and the Mercer County Jail. He arrived at the Mercer County Jail about July 15, 1978. The chaplain is in the jail's cell block areas from four to six days a week for two hours per day. On occasion, he takes a cart containing books to the prisoners and also makes available such items as puzzles, playing cards, checkers, a chess set, and bingo equipment. As noted, the books provided by the chaplain are primarily of a Christian religious nature. When his book cart became inoperable, the chaplain arranged for the inmates to be allowed to visit the trusty side once a week to look at the books kept there. As noted, a library did not exist at the jail prior to the chaplain's arrival. Since then, such a library as does exist is by virtue of the chaplain's efforts.

Chaplain Chancellor is not paid by Mercer County for any of his services. He works at the jail with the permission of the Sheriff and he must get the Sheriff's approval on all the activities he conducts there. When the chaplain makes his rounds, he typically spends fifteen minutes in each section of the jail. At one time, the chaplain had arranged for a lay woman to come to the jail to see and counsel with inmates. Upon the death of her husband, however, her visits ceased. Chaplain Chancellor has set up the following activities:

| | |
|---|---|
| Sunday, 9:00 a.m. | – Religious Chapel services for one hour. |
| Sunday afternoon | – Chaplain Chancellor is available for counseling on primarily religious matters. |
| Monday | – Chaplain Chancellor makes rounds of the jail and distributes religious literature. |
| Tuesday | – A GED program is administered for one and a half to two hours. |
| Wednesday | – The Chaplain goes to the cell block areas.<br>– Alcohol and Drug Discussion meets for one hour. |
| Thursday | – Bible classes for an hour. |
| Thursday evening | – Religious film shown. |
| Friday | – Prisoners are allowed to make a selection from the books that exist at the jail. |

Due to the lack of alternative programs at the jail, almost all the inmates participate to some degree in the religious programs and the drug and alcohol discussion sessions even if they have neither desire nor use for such instruction.

The almost complete absence of any vocational, educational, work, recreational, or rehabilitation programs at the jail create conditions for the inmates which are extremely harsh and which are not reasonably related to a legitimate governmental purpose. Moreover, the lack of constructive use and occupation of the inmates' time and

energy is contrary to the defendants' interest in jail security and the preservation of order and discipline.

### Access To Legal Representation and To Legal Materials

Attorneys for indigent criminal defendants in Mercer County are appointed through a court operated system.[16] Attorneys representing criminal defendants are permitted to confer with their clients at any time unless the visit would in some manner interfere with jail security. Generally speaking, the Mercer County Bar testified to a favorable degree of cooperation by the jail administration with the bar's attempts to represent their clients. Neither Judge Bivens nor the members of the local bar who testified could identify an instance where a criminal defendant's rights had been violated because of a failure to see an attorney.

With respect to lawyers representing inmates on civil matters, however, the jail personnel have not been as helpful. For instance, the Sheriff on June 6, 1978, refused to allow counsel for the plaintiffs to visit and interview inmate Norris Garrett after counsel had been advised by Mr. Garrett's criminal case attorney that Mr. Garrett wished to speak to him.

Access by pre-trial detainees to a telephone with which to contact attorneys or prospective witnesses is by request to trusties, deputies, or the chaplain that they be taken to a phone or that a call be placed for them. As earlier noted, where the detainee himself makes the call, he must be unlocked from his cell area by a deputy and escorted to a phone. Frequently requests by detainees to use the phone to call their attorney are not responded to by the jail's staff. Nor does the jail arrange for legal representation of inmates. As noted, however, the circuit court does appoint counsel for indigent criminal defendants. Sentenced inmates experience all of these same disabilities.

The jail administration does not provide access by any prisoner to legal materials or law books or typewriters. Nor does it provide inmates with assistance from persons trained in the law to help the inmates fashion civil or criminal complaints. Further, the jail staff has been uncooperative and obstructive to the prisoners' attempts to represent themselves. Deputies have on a number of occasions threatened to destroy inmate-prepared legal documents, have prevented the delivery of court-prepared blank forms, and have not cooperated with the inmates in their attempts to have signatures notarized. These circumstances have denied the inmates access to the courts on matters unrelated to their initial criminal charges.

### Attorney-Client Interview Facilities

Two different areas are provided at the jail for attorney-client meetings. One is the attorney-client room on the third floor of the courthouse and the other is the basement office normally used by the chaplain. Conferences by an attorney in an inmate's cell area are occasionally permitted upon a showing of necessity.

Prior to this court's order of June 15, 1978, conversations in the third floor attorney-client interview room were capable of being overheard through the intercom system. This room is used by the trusties as both a television room and wash room. It is also the passageway for the shower used by women housed in the side cells. The furniture in the room is old and deteriorated. By virtue of the multiple uses made of this room, it is not conducive to private discussions between inmate and counsel.

### Possible Discriminatory Treatment

During the period from January 1, 1977, to July 31, 1978, there were 309 calendar days when at least one woman was incarcerated at the jail. There being 577 days from January 1, 1977, to July 31, 1978, women were thus incarcerated at the jail for 53.5% of the calendar days during that

---

16. The State of West Virginia has adopted a Public Defender program applicable to Mercer County, effective July 1, 1981. W.Va.Code §§ 29–21–1 et seq. The State, however, has not implemented the Public Defender system as of the entry of this decree.

period.[17] The length of stay for a female prisoner is usually three days or less. The jail administration employs only one female deputy as a matron at the jail. Consequently, male deputies are frequently used to care for female prisoners who are often alcoholics. The jail administration has no special recruitment program for the hiring of women at the jail. There have been no female trusties at the jail even though pre-trial detainees are eligible to serve as trusties.

Female inmates are placed in the side cells where they are without access to a day room and where they must be escorted to a shower adjacent to the third floor attorney-client interview room by a deputy. Two or three women are occasionally placed in the 132 square-foot side cells. The privacy of the women in the side cells is severely infringed upon in that male inmates, trusties, and deputies can look into the cells from the corridor and observe the entire cell area, including the beds and toilet areas. Frequently, obscene comments and annoying remarks are made to the women. Women are not allowed to attend the GED programs, the alcohol and drug discussion sessions, or the religious programs at the jail. They are not provided with separate or alternative programs for their own use.

The Sheriff testified that less than 40% of the inmate population is normally black. Other testimony placed the range as between 20% and 40%. As already observed, there are no black deputies employed at the jail. Rarely are blacks appointed trusties, the testimony indicating one such instance.

*Other Conditions*

Approximately 80% of the jail population is composed of pre-trial detainees who are given substantially the same treatment as to visitation, mail, recreation, and trusty eligibility as is the rest of the jail popula-

tion. There is no provision made at the jail for allowing any inmates to be taken to the polls on election day for voting or to provide absentee ballots.

*Conclusions*

The conditions existing at the jail serve to punish the pre-trial detainees and severely deprive the inmates, subjecting them to the specter of physical and emotional damage by their experiences in the substandard, debilitating environment of the jail. No valid or legitimate correctional or governmental purpose is served by the inadequacies, deprivations and unjustifiable risks and hazards outlined in these findings of fact and emphasized in the court's conclusions of law.

## II. Conclusions of Law—Generally

### A. The Function of Constitutional Review

■ The federal judiciary has traditionally followed a policy of substantial deference to those persons charged with the administration of state prisons and jails. This deference, frequently characterized as the "hands-off" policy, is premised upon notions of federalism and constitutes a recognition of the nonexpertise of the judiciary in the daily administration of a jail or prison. As stated in *Bounds v. Smith*, 430 U.S. 817, 832, 97 S.Ct. 1491, 1500, 52 L.Ed.2d 72 (1977), the federal courts do "not 'sit as co-administrators of state prisons.'"

The hands-off policy has not, however, been applied as an absolute in recent years. Beginning with the Supreme Court's decisions in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), it was established that constitutional deprivations occurring within the confines of a state prison or jail are actionable pursuant to 42 U.S.C. § 1983.[18]

---

17. The parties stipulated that there are female prisoners at the jail from 20% to 25% of the time including week-ends.

18. The highly publicized prisoner rebellion and ensuing bloodshed at New York's Attica State Prison in September, 1971, has also been attributed as cause for the mitigation of the hands-

off policy. *See* T. Wicker, *A time to Die* (1975); A. Bronstein, *Offender Rights Litigation: Historical and Future Developments*, II Prisoner Rights Sourcebook at 8–9 (1980); I. Robbins, *The Cry of Wolfish in the Federal Courts: The Future of Federal Judicial Intervention in Prison Administration*, 71 J. of Crim.L. & Criminology 211 (1980).

The deference counseled by the hands-off policy has thus been merged with the federal courts' duty to address and, when appropriate, vindicate the constitutional rights of prisoners. This is reflected in Mr. Justice Rehnquist's admonition in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), that:

[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

416 U.S. at 405–06, 94 S.Ct. at 1807–08; *see also Bolding v. Holshouser*, 575 F.2d 461, 466 (4th Cir. 1978), *cert. denied*, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978).

■ The tradition of deference has, nevertheless, been manifested as an integral component of constitutional analysis in recent decisions of the United States Supreme Court. Thus, in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court held that constitutional review of the conditions of confinement of pre-trial detainees must rest on a determination of whether the conditions reflect punitive intent on the part of prison administrators. Likewise, in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), the Court held that a prisoner did not have a constitutionally protected liberty interest in remaining at a less restrictive prison absent a state law or practice conditioning the transfer on proof of serious misconduct. The Court recognized in *Meachum* that prison transfers are a matter of administrative judgment and not of constitutional concern unless a prisoner's incarceration in a particular prison is embodied as an entitlement which, by state law, may not be withdrawn at the unabridged discretion of prison personnel. Even when a prisoner's fundamental constitutional rights are infringed by the action of prison administrators, such action may withstand constitutional challenge if the infringement is reasonably related to a legitimate penological objective. *See, e. g., Jones v. North Caroli-*

*na Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977) ("The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.").

Although certain conditions or practices at a prison or jail are held to be constitutionally invalid, the hands-off policy counsels deference to the administrators of the prison or jail in fashioning a remedy to alleviate each unconstitutional condition or practice. If, however, an official under the compulsion of a court order fails to formulate and implement such remedies, courts have thereafter ordered particularized relief notwithstanding the hands-off policy. This is reflected in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), where the Court affirmed a district court's decree which fashioned specific remedies for unconstitutional conditions in the face of defendants' noncompliance with the court's previous orders. The Court stated that:

As we explained in *Milliken v. Bradley*, 433 U.S. 267, 281, [97 S.Ct. 2749, 2757, 53 L.Ed.2d 745] state and local authorities have primary responsibility for curing constitutional violations. "If, however '[those] authorities fail in their affirmative obligations . . . judicial authority may be invoked.' *Swann* [*v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1,] 15 [91 S.Ct. 1267, 1276, 28 L.Ed.2d 554]. Once invoked, 'the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.' " *Ibid.* In this case, the District Court was not remedying the present effects of a violation in the past. It was seeking to bring an ongoing violation to an immediate halt.

437 U.S. at 687, n.9, 98 S.Ct. at 2572, n.9.

■ It must be noted that certain unconstitutional conditions and practices by their nature bespeak only one constitutionally permissible response. The fashioning

of remedies for such "single-edged" unconstitutional conditions and practices are solely within the province of the judiciary and are not amenable to a hands-off approach in fashioning the appropriate remedy. For purposes of example, compare the failure to afford procedural due process safeguards where required with a failure to provide minimally adequate plumbing and plumbing fixtures. The remedy for the former condition is solely a function of constitutional law whereas the latter brings into question state and local housing codes, expert opinion and standards promulgated by various interest groups. Thus, in *Bell v. Wolfish, supra,* the Court rejected the substitution by the lower courts of their judgment regarding the prison's restrictive policy on the receipt of packages by prisoners, stating that although the trial court's remedy was a reasonable response to the institution's interest in maintaining security, order and sanitation, "[i]t simply [was] not ... the only constitutionally permissible approach to these problems." 441 U.S. at 554, 99 S.Ct. at 1882. The courts have accordingly abstained from articulating specific remedies to unconstitutional conditions and practices in those instances where a specific remedy is not constitutionally compelled.[19]

### B. Eighth Amendment and Fourteenth Amendment

The Eighth Amendment to the United States Constitution provides in pertinent part that "cruel and unusual punishment [shall not be] inflicted." Although the Eighth Amendment was drafted with the particularly heinous tortures and punishments of the Eighteenth Century in mind, it has since been recognized that the amendment addresses not only direct punishment but also indirect (that is, condition-based) punishment falling beyond the limits of contemporary standards of civility. *See Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (1958). Thus, the Eighth

Amendment is not static. Rather, it "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. at 100–01, 78 S.Ct. at 597–98.

In recent years, the Eighth Amendment has been held to proscribe conditions and practices which "involve the unnecessary and wanton infliction of pain ...." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), *citing Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976), or which are "barbarous" or "shocking to the conscience." *Sostre v. McGinnis,* 442 F.2d 178, 191 (2d Cir. 1971), *cert. denied sub nom., Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), *and Oswald v. Sostre,* 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). "If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight." *Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir. 1977), *remanded with instructions sub nom., Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114, *cert. denied sub nom.,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *see also Ahrens v. Thomas,* 570 F.2d 286, 289 (8th Cir. 1978); *Hite v. Leeke,* 564 F.2d 670, 672 (4th Cir. 1977). A similar expression of the Eighth Amendment states that "[t]here exists a fundamental difference between depriving a prisoner privileges he may enjoy and depriving him of the basic necessities of life. We think this is the minimal line separating cruel and unusual punishment from conduct that is not." *Cunningham v. Jones,* 567 F.2d 653, 656 (6th Cir. 1977), *citing, Finney v. Arkansas Board of Correction,* 505 F.2d 194, 208 (8th Cir. 1974). As expressed in *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Eighth Amendment "prohibits penalties that are grossly

---

19. As previously observed, instances where prison officials have failed to comply with court orders requiring the upgrading of conditions of confinement stand as an exception to this principle. *See Hutto v. Finney,* 437 U.S. at 687, n.9, 98 S.Ct. at 2572, n.9; *see generally* Comment, *Complex Enforcement: Unconstitutional Prison Conditions,* 94 Harv.L.Rev. 626, 645–46 (1981).

disproportionate to the offense, . . . as well as those that transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" 437 U.S. at 685, 98 S.Ct. at 2570.

■ The Fourteenth Amendment, which incorporates and makes applicable to the states the Eighth Amendment's prohibition of cruel and unusual punishment, also governs suits challenging prison conditions and practices, particularly with respect to the due process rights of pre-trial detainees who make up approximately 80% of the inmate population at the Mercer County Jail. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court held that the Fourteenth Amendment proscribes conditions and practices affecting pre-trial detainees which are punitive. Absent proof of an express punitive intent on the part of prison administrators, *Wolfish* provides that such intent may be inferred if the condition or practice otherwise constitutes "punishment in the constitutional sense of that word." 441 U.S. at 538, 99 S.Ct. at 1873. This inquiry requires the courts to consider whether legitimate governmental purposes may be rationally connected with the condition or practice, and whether the condition or practice appears unduly excessive in relation to such purpose. The hands-off policy is integrated in this constitutional analysis as reflected in the Court's admonition that:

> In determining whether restrictions or conditions are reasonably related to the government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to those considerations, courts should ordinarily defer to their expert judgment in such matters."

441 U.S. at 540–41, n.23, 99 S.Ct. at 1875, n.23.

■ In *Wolfish*, the Court did not catalog the array of legitimate governmental interests that justify the imposition of otherwise seemingly severe conditions or restrictions on pre-trial detainees. It did, however, recognize that "in addition to ensuring the detainees' presence at trial [and prison security], the effective management of the detention facility . . . is a valid objective that may . . . dispel any inference that such restrictions are intended as punishment." 441 U.S. at 540, 99 S.Ct. at 1875 (footnote omitted). The Supreme Court has previously recognized that economic concerns are a significant factor in the effective management of jails and prisons. *See, e. g., Bounds v. Smith*, 430 U.S. 817, 825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977). Yet, it is also established that the "cost of protecting a constitutional right cannot justify its total denial." *Id.* Once a state legitimately deprives a person of his liberty, it is required to shoulder the economic burden necessary to preserve the constitutional rights retained by the person within the walls of the jail or prison. *See Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980); *Battle v. Anderson*, 594 F.2d 786, 792 (10th Cir. 1979), *further proceedings*, 614 F.2d 251 (10th Cir. 1980); *Burks v. Teasdale*, 603 F.2d 59, 62 (8th Cir. 1979); *Todaro v. Ward*, 565 F.2d 48, 54 n.8 (2d Cir. 1977); *Smith v. Sullivan*, 611 F.2d 1039, 1043–44 (5th Cir. 1980); *Nadeau v. Helgemoe*, 561 F.2d 411, 417 (1st Cir. 1977); *Johnson v. Levine*, 450 F.Supp. 648, 654 (D.Md.1978), *aff'd*, 588 F.2d 1378 (4th Cir. 1978).

■ *Wolfish* also addressed the relationship between the Eighth and Fourteenth Amendments as they affect pre-trial detainees when it stated that pre-trial detainees "retain at least those constitutional rights that . . . are enjoyed by convicted prisoners." 441 U.S. at 545, 99 S.Ct. at 1877. As such, conditions and practices in a given institution which constitute unconstitutional punishment under the less scrutinizing Eighth Amendment standard as to convicted prisoners are likewise unconstitutional as to pre-trial detainees. *See also Campbell v. Cauthron*, 623 F.2d 503, 505 (8th Cir. 1980); *Inmates of Allegheny*

*County Jail v. Pierce*, 612 F.2d 754, 762 (3rd Cir. 1979).

### C. State Statutory Standards

■ In addition to the Eighth and Fourteenth Amendments' standards of constitutionality, there exists a panoply of state statutory standards which govern the conditions and practices of the Mercer County Jail. Article 7, chapter 8 of the West Virginia Code delegates the responsibility for the construction and maintenance of county jails to the county court and sheriff of each county.[20] Many of the provisions in Article 7, chapter 8 are virtually identical to the original statutes enacted shortly after West Virginia's attainment of statehood in 1863 and, as such, sometimes appear anachronistic.[21] They nevertheless constitute controlling state law and, in certain instances, may give rise to liberty and property interests secured to county prisoners by the Fourteenth Amendment to the United States Constitution. *Compare Wolff v. McDonnell*, 418 U.S. 539, 556–57, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974) (A Nebraska statute providing for good time credits gave rise to a conditional liberty interest for prisoners), *with Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (State prisoner had no liberty or property interest affected by transfer to a more secure institution absent a state statute limiting the discretion of prison administrators in effectuating transfers); *see also Goss v. Lopez*, 419 U.S. 565, 572–76, 95 S.Ct. 729, 735–37, 42 L.Ed.2d 725 (1975) (Ohio statute gave rise to a property interest in public education).

West Virginia Code § 7–8–2 (Replacement Vol. 1976), establishes a non-discretionary duty on the jailer of each county jail (the sheriff or deputy sheriff) to maintain the jail in a sanitary condition and provide for the medical care of prisoners as follows:

**20.** By virtue of an amendment to Article IX, section 9 of the West Virginia Constitution, county courts are now designated as county commissions.

**21.** *See, e. g.*, W.Va.Code § 7–8–7 (Replacement Vol. 1977) which provides that "The county

[The jailer] shall keep the jail in a clean, sanitary and healthful condition. When any prisoner is sick the jailer shall see that he has adequate medical and dental attention and nursing, and so far as possible keep him separate from other prisoners. Any such medical care and nursing as the jailer may be required to furnish shall be paid by the county court. A failure on the part of the jailer to perform any of the duties herein required ... shall be a contempt of any court of record under whose commitment such prisoner is confined ....

Section 7–8–2a requires the county commission of each county to:

[P]rovide wholesome and sufficient food and clean and sufficient bedding for all prisoners confined in the county jail, and shall furnish the soaps, disinfectants and other supplies needed by the jailer in the performance of his duties.

Section 7–8–11 creates a right to good time credits for county prisoners as follows:

Every prisoner sentenced to the county jail for a term exceeding six months who, in the judgment of the sheriff, shall faithfully comply with all rules and regulations of said county jail during his term of confinement shall be entitled to a deduction of five days from each month of his sentence.

In addition to the foregoing, every prisoner who desires to and does donate blood to any person, agency, organization, corporation or association as may be approved by the sheriff, shall be entitled to a deduction of five days from his sentence for each pint of blood so donated.

Finally, section 7–3–2 addresses the construction and design of county jails by providing, in pertinent part, that:

The county [commission] shall keep the ... jail in constant and adequate repair,

court may also, after examination, when a person in its jail charged with or convicted of an offense is unable to provide himself with sufficient clothing, direct the jailer to provide him clothing, and allow therefor not exceeding twenty dollars in one year."

and supplied with the necessary heat, light, furniture, record books, janitor service and ... necessary stationery and postage, and such other things as shall be necessary .... Such ... jails ... hereafter erected shall be built of stone and brick, or stone or brick, or other equally fireproof materials .... The jails shall be well secured, and sufficient for the convenient accommodation of those who may be confined therein, and so that convicts may be in apartments separate from each other, and from the other prisoners; every apartment shall be so constructed that it can be kept comfortable.[22]

### D. Totality of Conditions and Discrete Adjudication Analyses

In cases challenging the overall conditions and practices at a prison or jail, courts often employ a totality of conditions analysis. Properly applied, such an analysis requires that each thread in the fabric of challenged conditions be isolated, yet judged with an appreciation of its interdependent existence.[23] This approach was employed in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), wherein the Supreme Court affirmed the lower court's remedial order regarding isolated confinement by noting that:

> The court was entitled to consider the severity of ... [past constitutional] violations in assessing the constitutionality of conditions in the isolation cells. The court took note of the inmates' diet, the continued overcrowding, the rampant violence, the vandalized cells, and the "lack of professionalism and good judgment on the part of maximum security personnel."

410 F.Supp., at 277 and 278. The length of time each inmate spent in isolation was simply one consideration among many. We find no error in the court's conclusion that, taken as a whole, conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment.

437 U.S. at 687, 98 S.Ct. at 2571.

Totality of conditions analysis stands in contrast with what has been described as "discrete adjudication."[24] The latter mode of adjudication focuses on a specific practice or policy and draws a "clear boundary between a violation and its background."[25] This is illustrated in *Bell v. Wolfish*, where the Supreme Court considered five specific practices in isolation from each other. The primary constitutional concern in the discrete adjudication of isolated issues is the determination of the rationality of a given practice or policy in relation to a fundamental constitutional right.[26]

An appreciation of the distinction between totality of conditions and discrete adjudication analyses is significant in the case at bar. Although the plaintiffs' allegations and trial proof are fashioned upon a totality of conditions approach, several of the challenged conditions and practices must be considered on a discrete adjudicatory basis in keeping with recent Supreme Court precedent. *See, e. g., Bell v. Wolfish, supra* (Publisher-only rule, gift packages rule, unannounced search of cells outside of inmates' presence and visual anal and genital searches for contraband all considered in isolation from one another and prison conditions generally); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (Prison disciplinary procedures considered in isolation from general prison con-

---

**22.** *See* note 31, *infra.*

**23.** *See generally* A. Bronstein, *supra* note 1, at 13; Comment, *Confronting the Conditions of Confinement: An Expanded Role for Courts in Prison Reform*, 12 Harv.Civ.Rights—Civ.Lib.L. Rev. 367 (1977).

**24.** *See* Comment, *Complex Enforcement: Unconstitutional Prison Conditions*, 94 Harv.L. Rev. 626, 628 (1981).

**25.** *Id.* at 629.

**26.** Although it is difficult to draw a clear semantical line between prison *conditions* and prison *practices*, it may be observed that totality of conditions analysis is often more suited to the consideration of the physical conditions of confinement, whereas discrete adjudication usually presupposes that a challenged practice is not of an interdependent nature and may, therefore, be isolated for purposes of constitutional analysis.

**1286**

ditions); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (Challenge to medical care may focus solely upon proof of specific acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs). Other practices do not fit neatly into a single mode of analysis and, therefore, must be considered with both analyses in mind.

### E. Equal Protection

In addition to alleging that the conditions of confinement at the Mercer County Jail violate the Eighth Amendment, the due process clause of the Fourteenth Amendment, various fundamental constitutional guarantees [27] and state statutes, plaintiffs challenge the conditions at the jail as violative of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs assert that an unjustifiable classification has occurred by virtue of the fact that prisoners in the Mercer County Jail are subjected to a host of life and health endangering conditions to which prisoners at the West Virginia State Penitentiary at Moundsville (hereinafter, the State Prison) are not exposed.

The State Prison is a maximum security prison for men convicted of felonies under the laws of the State of West Virginia. It is run by the West Virginia Department of Corrections. The parties have stipulated that as of March 1, 1979, there were approximately 650 inmates in the State Prison whose average length of incarceration was twenty-two months. The stipulations further reveal a substantial disparity between the relatively favorable conditions, practices and resources at the State Prison and those found at the Mercer County Jail.

■ Plaintiffs contend that inasmuch as pre-trial detainees retain, at a minimum, the same rights enjoyed by convicted prisoners, *see Bell v. Wolfish*, 441 U.S. at 545,

99 S.Ct. at 1877, the classification between the pre-trial detainees and convicted prisoners incarcerated in the Mercer County Jail and the felons incarcerated in the State Prison bears no rational relationship to a legitimate state purpose.[28]

The sharp contrast in many of the conditions found in the Mercer County Jail and those at the State Prison is disturbing, and plaintiffs' equal protection claim has considerable appeal. It is, however, unfounded as a matter of law. A similar contention was presented in *Kersh v. Bounds*, 501 F.2d 585 (4th Cir. 1974), where plaintiffs challenged the failure of the State of North Carolina to provide to a pre-trial detainee and two prisoners with pending appeals the same elective medical services as those provided state prisoners convicted of felonies incarcerated in the state prison system. Under the North Carolina Code, safekeeper prisoners, such as the pre-trial detainee and prisoners with pending appeals, were the responsibility of the county where the prisoner was to be or had been tried. Thus, the responsible county was billed by the State Department of Corrections for safekeeper prisoners held by the Department. The district court had held that the availability of elective medical service to prisoners based upon which state instrumentality paid the prisoner's expense was arbitrary and that the resulting disparity in medical services was violative of the equal protection requirement. The court of appeals rejected plaintiffs' equal protection argument:

We think the district court erred when it held the Equal Protection Clause violated upon the facts of this case. Under the North Carolina System, Department prisoners are those who have exhausted their avenues of appeal and are serving their sentences, and all such prisoners are furnished the disputed elective medical

---

**27.** Most notably, rights afforded by the First, Fourth and Sixth Amendments.

**28.** The court observes that plaintiffs do not directly challenge the state statutory scheme which is responsible for the division of authori-

ty between counties and the State Department of Corrections for the provision of jails (by the counties for pre-trial detainees and convicted prisoners) and prisons (by the State for felons).

care. Safekeeper prisoners, however, are not in that category, for they have not yet been committed to the custody and control of the Department, despite the fact that some safekeepers may be assigned to the Department for custodial purposes only at the expense of the county. The difference is at once apparent. Prisoners whose terms are not fixed by reason of pending appeals or because not yet tried are safekeepers, prisoners of the county. North Carolina has simply said that those charged with or convicted of crime are county prisoners until they begin serving their sentences, at which time they become Department prisoners. Since the county prisoners are treated alike and the Department prisoners treated alike, we are of opinion there is no equal protection violation. The fact that some county prisoners are housed in Department prisons is not of constitutional significance nor is the fact that the county continues to bear the expense of those prisoners.

501 F.2d at 588.

The court of appeals further stated that even if it were assumed that the State Department of Corrections could only have one category of prisoners comprised of all prisoners in its custody, there would still be no equal protection violation inasmuch as the court concluded that a rational basis existed for not providing elective medical services to the shorter term safekeeper prisoners. See 501 F.2d at 588–89.

Under the reasoning of *Kersh*, the state may delegate the responsibility for the maintenance of one class of prisoners to the county governments and another class to the State Department of Corrections. This division of authority may in no instance justify subjecting county prisoners to unconstitutional conditions or practices, but it does not, as a matter of constitutional compulsion, require that the amenities afforded by the two responsible authorities be identical. See also *Jamieson v. Robinson*, 641 F.2d 138 (3rd Cir. 1981). Differences in the conditions and practices at the various institutions of the two governmental entities are inevitable. Thus, where a practice or policy in the Mercer County Jail is constitutionally sound, this court must defer to the informed judgment of the persons charged with the jail's management even though a seemingly more enlightened approach has been adopted for the State Prison. Although reference to the conditions, practices and, in particular, rules of the State Prison may be invaluable in the fashioning of remedies, those rules, practices and conditions do not here give rise to an arbitrary or irrational classification in violation of the Equal Protection Clause of the Fourteenth Amendment.

III. *Conclusions of Law—The Constitutionality of the Challenged Conditions and Practices at the Mercer County Jail*

Applying these constitutional and statutory standards to the amalgam of challenged conditions and practices at the Mercer County Jail, the court reaches the following conclusions.

A. Plumbing

Functioning sinks, toilets and showers are basic necessities of modern life, particularly within the confines of a wholly self-contained environment such as a jail. Plumbing which is so inadequate and in such a state of disrepair as to constitute a serious threat to the physical and mental well-being of prisoners has therefore been condemned as violative of the Eighth Amendment in a variety of contexts. *See, e.g., Gates v. Collier*, 501 F.2d 1291, 1300–03 (5th Cir. 1974) (state prison); *Dimarzo v. Cahill*, 575 F.2d 15, 16 (1st Cir. 1978) (county jail), *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978); *Johnson v. Levine*, 450 F.Supp. 648, 656 (D.Md.1978), *modified*, 588 F.2d 1378 (4th Cir. 1978) (state prison); *Valentine v. Englehardt*, 474 F.Supp. 294, 297 (D.N.J.1979) (county jail); *Eckerhart v. Hensley*, 475 F.Supp. 908, 917 (W.D.Mo. 1979) (state mental institution).

The disrepair and utter inadequacy of the plumbing and plumbing fixtures at

the Mercer County Jail is manifest in the court's findings of fact. The combination sink/commode fixtures are unsanitary, odorous and often inoperable, resulting at times in the overcrowding of cells having functional plumbing. Frequently inoperable, too, are the showers. It is further observed that female prisoners are customarily housed in the side cells where the failure to provide commodes sheltered from general vision needlessly infringes on their right of privacy. *See Forts v. Ward*, 621 F.2d 1210, 1217 (5th Cir. 1980).

■ The condition of the plumbing and plumbing fixtures constitutes an unjustifiable hazard to the health of each prisoner. Indeed, the inmates are from time to time thereby deprived of the most rudimentary personal hygiene. *See Hite v. Leeke*, 564 F.2d 670, 672 (4th Cir. 1977). The defendants have not presented, nor is there otherwise apparent, any rational connection between the condition of the plumbing at the jail and a legitimate governmental interest. The court concludes that, whether scrutinized in isolation or in light of the totality of conditions documented in the findings, the antiquated, neglected and unsanitary state of the plumbing and the plumbing fixtures is both punitive and violative of the Fourteenth Amendment rights of the pre-trial detainees and the Eighth Amendment rights of the convicted inmates. It also constitutes a breach of defendants' statutory duties under W.Va.Code §§ 7–8–2, 7–3–2 (Replacement Vol. 1977), to keep the jail in a "clean, sanitary and healthful condition" and in "constant and adequate repair." By its nature, this unconstitutional condition is not one that is subject to only one constitutionally permissible remedy. Accordingly, defendants shall submit a plan to provide adequate, sanitary and regularly maintained plumbing and plumbing fixtures in keeping with constitutional and statutory standards.

## B. Lighting

■ The failure to provide security quality lighting fixtures of sufficient illumination to permit detainees and convicted inmates to read without injury to their vision constitutes a danger to the health and security of pre-trial detainees and prisoners alike. Inadequate lighting has been recognized in a variety of contexts as constituting cruel and unusual punishment violative of the Eighth Amendment when, in the absence of a valid governmental interest, it unnecessarily threatens the physical and mental well-being of prisoners. *See, e.g., Bono v. Saxbe*, 620 F.2d 609, 617 (7th Cir. 1980) (state prison); *Ramos v. Lamm*, 485 F.Supp. 122, 155 (D.Col.1979) (state prison); *Hamilton v. Landrieu*, 351 F.Supp. 549, 554–55 (E.D.La.1972) (county jail); *Jones v. Wittenberg*, 323 F.Supp. 93, 95–96 (N.D. Ohio 1971) (county jail), *aff'd sub nom., Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972). When considered in conjunction with the lack of significant exposure to natural sunlight, and the generally dark and idle environment at the jail, the inadequate lighting constitutes a danger to the eyesight of the prisoners and contributes to the dank and lifeless atmosphere found in the jail. This condition is also contrary to defendants' statutory obligations under W.Va.Code §§ 7–8–7, 7–3–2 (Replacement Vol. 1977). Moreover, defendants have not presented a legitimate governmental interest furthered by the maintenance of the jail's lighting in its current state. The court therefore holds that the inadequacy of the lighting of the Mercer County Jail constitutes a denial of a basic necessity of life violative of the Fourteenth Amendment rights of the pre-trial detainees and the Eighth Amendment rights of the convicted prisoners housed therein. Accordingly, defendants shall submit a plan to provide adequate and regularly maintained lighting.

## C. Bedding, Clothing and Toilet Articles

■ The failure to regularly provide prisoners with clean bedding, towels, clothing and sanitary mattresses, as well as toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror

and sanitary napkins for female prisoners constitutes a denial of personal hygiene and sanitary living conditions. *See Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), *remanded with instructions sub nom., Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114, *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *McCray v. Burrell*, 516 F.2d 357, 368 (4th Cir. 1975), *cert. dismissed*, 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976); *Bolding v. Holshouser*, 575 F.2d 461, 464–65 (4th Cir. 1978), *cert. denied*, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978); *Ahrens v. Thomas*, 434 F.Supp. 873, 890–91 (W.D.Mo. 1977), *modified*, 570 F.2d 286 (8th Cir. 1978); *see also Wooten v. Shook*, 527 F.2d 976, 977 (4th Cir. 1975). The resulting danger to the prisoners' health is manifest in the parasitic skin conditions which often plague the prisoners. Defendants have not presented, nor is there otherwise apparent, any legitimate purpose served by this deprivation. The court therefore finds this condition to be violative of the Fourteenth Amendment as to pre-trial detainees and the Eighth Amendment as to convicted prisoners.[29] Defendants shall accordingly submit a plan to provide prisoners with regularly washed bedding, towels and clothing, basic toilet articles and regularly sanitized mattresses.

## D. Housekeeping

■ The failure to provide for and require rudimentary housekeeping and cleaning at the jail has resulted in an unnecessarily filthy and denigrating environment which threatens the physical and mental well-being of the prisoners. There is no evidence in the record suggestive of any governmental interest served by this neglect. *See Pugh v. Locke*, 406 F.Supp. 318, 330 (M.D.Ala.1976), *aff'd in part and remanded in part sub nom., Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *remanded with instructions sub nom., Alabama v.*

*Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Jones v. Wittenberg*, 330 F.Supp. 707, 717–18 (N.D.Ohio 1971), *aff'd sub nom., Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972). Moreover, this condition is violative of defendant commissioners' statutory duty under W.Va.Code § 7–8–2a (Replacement Vol. 1977) to "furnish the soaps, disinfectants and other supplies needed by the jailer in the performance of his duties" and the defendant sheriff's statutory duty under W.Va.Code § 7–8–2 (Replacement Vol. 1977) to "keep the jail in a clean, sanitary and healthful condition."

Defendants shall accordingly submit a plan to assure the regular cleaning of the jail.

### E. Prisoner Safety—Classification—Staffing

#### 1.

The compendium of deplorable conditions thus far discussed are all, in part, related to the acute shortage of properly trained deputy sheriffs at the jail. The effects of this shortage are most critically manifested in the instances of homosexual assault, beatings, fights and suicides that have occurred in the jail and in the potential for a fatal fire.

■ Prisoners have the right, secured by the Eighth and Fourteenth Amendments, to be reasonably protected from the threat of violence and sexual assault. *See Woodhous v. Commonwealth of Virginia*, 487 F.2d 889, 890 (4th Cir. 1973); *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854, 858 (4th Cir. 1975). Prisoners likewise have the right not to be subjected to the unreasonable threat of injury or death by fire. *See Ramos v. Lamm*, 485 F.Supp. 122, 155 (D.Col.1979). Prisoners need not wait until they are actually in-

---

**29.** As well as, in part, violative of defendants' statutory duty under W.Va.Code § 7–8–2a (Replacement Vol. 1977) to provide "clean and

sufficient bedding for all prisoners confined in the county jail."

jured by an assault or a fire in order to obtain relief from such conditions. *See Trop v. Dulles*, 356 U.S. 86, 102, 78 S.Ct. 590, 598–99, 2 L.Ed.2d 596 (1958); *Woodhous v. Commonwealth of Virginia*, 487 F.2d at 890; *Dimarzo v. Cahill*, 575 F.2d 15, 18 (1st Cir. 1978), *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978).

◼ In *Woodhous*, the court articulated a two-step analysis to be employed when considering an Eighth Amendment challenge to a perceived risk of inmate harm. The court must first determine whether there is a pervasive risk of harm to the prisoners. If so, there must next be considered whether jail officials have exercised reasonable care to prevent the creation of the unreasonable risk of harm. 487 F.2d at 890. Writing in *Withers v. Levine*, 615 F.2d 158 (4th Cir. 1980), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980), Judge Haynsworth explained the application of the *Woodhous* test in the context of an alleged pervasive threat of sexual assault among prisoners at the Maryland House of Corrections as follows:

A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution. The defendants seized upon that explanatory phrase from *Woodhous* to contend that something approaching anarchy must be proven before a cause of action under *Woodhous* may be made out, but conditions need not deteriorate to that extent before the constitutional right to protection arises. It is enough that violence and sexual assaults occur on the idle tier at MHC with sufficient frequency that the younger prisoners, particularly those slightly built, are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures. The proof in this case and the findings of the district court fully meet those requirements.

It is not necessary to show that all prisoners suffer a pervasive risk of harm. It is enough that an identifiable group of prisoners do, if the complainant is a member of that group.

. . . .

When there is present in a prison or in an identifiable portion of it, a pervasive risk of harm to all prisoners, or to an identifiable group of them, the constitutional prohibition against cruel and unusual punishment requires that prison officials exercise reasonable care to provide reasonable protection from such unreasonable risk of harm. Given the pervasive and unreasonable risk of harm, negligence by prison officials in their performance of their duty of care is a violation of the constitutional right and actionable under § 1983. The constitutional right would often remain unredressed if a higher standard of care were required.

Moreover, the principal fault found by the district judge was the absence of any procedure for matching cellmates on the idle tier except the matter of the availability of a bed. In assigning a person such as Withers, whose age and physical characteristics put him in the high risk group for victimization by sexual assault, the absence of any procedure or guidelines to assist the assigning official was probably much more than simple negligence. It was the development of such procedures that the district court's injunction properly directed.

615 F.2d at 161–62. *See also Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980).

In the case at bar, the inadequacy of the jail's staffing has manifested itself in the violence documented in the court's findings of fact. Although this condition does not approach a "reign of terror" as adverted to in *Withers*, the systematic inadequacy of supervision at the jail places the prisoners in reasonable fear for their safety and well being. The findings also demonstrate an historical failure on the part of the defendants to exercise reasonable care to alleviate the pervasive risk of harm which exists. Defendants' understaffing practices are in no manner rationally connected to a legiti-

mate governmental interest. Indeed, defendants' failure to retain a trained staff of sufficient numbers gives rise to an unreasonable risk of violence in the jail and constitutes a violation of the Fourteenth Amendment as to pre-trial detainees and the Eighth Amendment as to convicted prisoners.

### 2.

■ The pervasive risk of harm to the prisoners is made more profound by the indiscriminate placing of prisoners in the jail without benefit of any initial screening or classification process that goes beyond the inmate's sex and sobriety.[30] This results in the indiscriminate placement of the mentally and physically sick with the healthy, the violent with the non-violent. Moreover, the failure to provide any classification as between convicted prisoners and pre-trial detainees is contrary to W.Va.Code § 7–3–2 (Replacement Vol. 1977) which requires in county jails that:

> The jails shall be well secured, and sufficient for the convenient accommodation of those who may be confined therein, and so that the *convicts* may be in apartments separate from each other, and from the *other prisoners* .... (Emphasis supplied)[31]

■ Under the totality of conditions present at the Mercer County Jail, the failure to screen and classify, coupled with attendant unreasonable risks to the safety

---

**30.** The direct relationship between the absence of a system of classification and the threat of harm to prisoners was discussed in *Laaman v. Helgemoe*, 437 F.Supp. 269 (D.N.H.1977), as follows:

> An effective diagnostic and classification system enables prison officials to separate and properly handle three basic groups of inmates: prisoners who pose a threat to the safety of other inmates or the institution; those who are in need of medical or psychiatric treatment; and those who could benefit from the programs the institution offers. Problems stemming from the failure to properly classify inmates are manifold.
>
> Prison officials do not dispute the evidence that most inmates are assigned to the various institutions, to particular dormitories, and to work assignments almost entirely on the basis of available space. Consequently, the appreciable percentage of inmates suffering from some mental disorder is unidentified, and the mentally disturbed are dispersed throughout the prison population without receiving treatment ...
>
> ... Violent inmates are not isolated from those who are young, passive, or weak....
>
> Emotional and physical disabilities which require special attention pass unnoticed. There is no rational basis on which to assign inmates to the few vocational, educational and work opportunities which do exist. All of this contributes to the apathy, tension and frustration which pervade Alabama prisons. *Pugh, supra,* 406 F.Supp. at 324.
>
> The state has a constitutional duty to "reasonably protect [inmates] from constant threat of violence and sexual assault by ... fellow inmates, ..." *Woodhous, supra,* 487 F.2d at 890. *McCray [v. Sullivan,] supra,* 509 F.2d [1332] at 1334; *Finney, supra,* 505 F.2d at 201; *Nadeau [v. Helgemoe,] supra,* 423

F.Supp. [1250] at 1261. Courts have ordered prison administrators to institute at the very least, minimal classification systems which separate inmates by "age, offense, physical aggressiveness, or other criteria which would warrant separate housing arrangements." *Goldsby [Carnes], supra,* 365 F.Supp. [395] at 402, *supplemented by* 429 F.Supp. 370, 376 (1977). *E.g., McCray, supra,* 509 F.2d 1332; *Gates, supra,* 501 F.2d 1291; *Rhem [v. Malcolm], supra,* 507 F.2d [333] at 338 (pretrial detainees); *Mitchell [v. Untreiner], supra,* 421 F.Supp. [886] at 895; *Alberti v. Sheriff of Harris County, Texas,* 406 F.Supp. 649, 669 (S.D.Tex.1975); *Pugh, supra,* 406 F.Supp. at 324, 329; *Hamilton v. Love,* 358 F.Supp. 338, 345 (E.D.Ark.1973). 437 F.Supp. at 318–19.

**31.** The provision for the separation of convicts from each other and from other prisoners has been part of the law of West Virginia since the first West Virginia Code in 1868. Its roots lie in antebellum legislation enacted by the Commonwealth of Virginia in the early 1820's, forty years before West Virginia's separation from the Commonwealth in 1863.

As late as 1819, the Virginia Code required the court of every county and corporation within the Commonwealth to erect and maintain "one common jail and county prison, well secured with iron bars, bolts and locks, and also one pillory, a whipping post, and stocks ..." The Acts of the General Assembly, 1822–23, set up the system of classifying and segregating prisoners from which West Virginia's statutory system is descended. The Acts provided:

> That, hereafter, the court of every county and corporation within this commonwealth, shall maintain, and keep in good repair, a good and sufficient common jail and prison, well secured with iron bolts, and bars, and locks,

of the prisoners, cannot withstand scrutiny under the Fourteenth Amendment as applied to pretrial detainees and the Eighth Amendment as applied to convicted prisoners. There is no evidence in the record suggesting a governmental purpose rationally connected with the failure to classify. Rather, substantial evidence shows that the failure to classify as manifested in the virtually haphazard placement of prisoners in the jail is a product of insufficient staffing, a condition which the court finds otherwise violative of the Eighth and Fourteenth Amendments. The court concludes that the failure to provide a system of screening and classification does not pass constitutional muster under the *Woodhous* standard and is, therefore, violative of the Fourteenth Amendment as to pre-trial detainees and the Eighth Amendment as to convicted prisoners.

### 3.

██ The totality of physical conditions at the jail as outlined in the court's findings

> and of a size, and with apartments, sufficient for the convenient accommodation of the prisoners who may, from time to time, be confined therein, so as *that convicts, and slaves not convicts, may be confined in apartments separate from each other, and from other prisoners.* And such apartments shall also be provided with adequate windows, in good repair, and with fireplaces, or stoves. And when the jails in any county or corporation within this commonwealth, shall not be such as are hereby required, the court thereof shall forthwith proceed to take the necessary measures for rendering the same conformable to this act; and, in default thereof, shall be liable to the penalties imposed by law for failing to erect and keep in repair a good and sufficient jail.

Acts of the General Assembly, 1822–23, p. 32, c. 30, § 6 (emphasis added).

The separation of convicts and slaves from each other, and the segregation of both from other prisoners, remained a part of Virginia's law into the 1860's. The Virginia Code of 1860 provided that:

> Every such jail shall be well secured, and sufficient for the convenient accommodation of those who may be confined therein, so that convicts and slaves not convicts, may be in apartments separate from each other and from the other prisoners. Each apartment shall be so constructed that it can be kept

of fact, coupled with staffing inadequacies, poses a pervasive threat of harm to prisoners by fire. Such an unnecessary peril finds no justification in any legitimate governmental interest. Indeed, this condition is contrary to the spirit of state statutory requirements as embodied in W.Va.Code § 7–3–2 (Replacement Vol. 1977). Moreover, the evidence amply demonstrates that the defendants have historically failed to take reasonable steps to correct the deficiencies repeatedly cited by the State Fire Marshal. The court concludes that the pervasive threat of injury or death by fire to prisoners housed in the jail constitutes a violation of the Eighth Amendment as applied to convicted prisoners and the Fourteenth Amendment as applied to pre-trial detainees.

### 4.

██ Standing in recognition of the causal relationship between these conditions and an unreasonable risk of harm to prisoners

> comfortable. The jail shall be kept in good repair.

Va.Code of 1860, p. 288, c. 50, § 2. After the Civil War, the word "slaves" was dropped, and replaced with the word "those." *See* Va.Code of 1873, c. 50, § 2.

One of the West Virginia Legislature's earliest acts was to require each county to provide "a suitable and sufficient jail." W.Va. Acts of 1863, c. 69, c. 78, § 7. When the Acts were first codified, the legislature added language derived from the Virginia Code of 1860, *supra*, to create a statute which required:

> That the supervisors of every county . . . shall provide . . . a suitable courthouse and jail . . . . The jail shall be well secured, and sufficient for the convenient accommodation of those who may be confined therein, and *so that the convicts may be in apartments separate from each other, and from the other prisoners.*

W.Va.Code of 1868, c. 39, § 28 (emphasis added). Every subsequent version of the Code has retained this section requiring the separation of convicts from each other and the segregation of convicts from other prisoners. See W.Va. Acts of 1881, c. 5 (moving the quoted section from Code c. 39 § 28 to Code c. 39 § 14); W.Va.Code of 1923, c. 39 § 14; and W.Va.Code of 1961, § 7–3–2 and subsequent revisions of that section.

are the multitude of reported cases in which courts have ordered an upgrading of prison and jail staffing,[32] the adoption of a meaningful system of classification [33] and the alleviation of fire trap conditions.[34]

Turning first to the inadequacy of staffing at the jail, the court observes that the upgrading of the staff to a constitutional level cannot be determined solely with reference to the number of jailers. Training, supervision and the personal make-up of the individuals employed all enter into a determination of the sufficiency of staffing. Another obvious consideration is that of the "subtle dynamics of staff-inmate relations" which are as much a product of the jail's general conditions and environment as of the quantity and quality of staff.[35] Consideration of these and other pertinent factors inevitably lead one to the conclusion that the hiring, training, supervision and deployment of jail staffs are matters best committed to the expertise and discretion of the jail's management. *See Bell v. Wolfish*, 441 U.S. at 540–41, n.23, 99 S.Ct. at 1875, n.23. The deference counselled by the Supreme

Court is of particular relevance to the question of jail staffing inasmuch as its resolution knows no precise constitutional quotient or formula. Rather, it is to a significant degree a matter of human relations and legitimate managerial discretion.

On the other hand, the size and physical layout of the multi-tiered, labyrinth-like Mercer County Jail, considered together with the number of prisoners housed there from time to time, indicate the need for a significant increase in personnel. Similarly, although the failure to provide staff training is not a condition which is amenable to only one constitutionally permissible response, the failure to provide any staff training, considered together with the concomitant risk of harm to both staff and prisoners, militates that at least some meaningful staff training be provided.

In sum, the failure to provide staff of adequate number and training results in an unconstitutional risk of harm to the prisoners. The remedy for this condition is a matter peculiarly within the province and expertise of the defendants.[36] Defendants

**32.** *See, e.g., Gates v. Collier*, 501 F.2d 1291, 1308 (5th Cir. 1975); *Alberti v. Sheriff of Harris County, Texas*, 406 F.Supp. 649 (S.D.Tex. 1975); *Owens-El v. Robinson*, 442 F.Supp. 1368, 1385 (W.D.Pa.1978), *enforcing*, 457 F.Supp. 984 (W.D.Pa.1978), *rev'd on other grounds*, 612 F.2d 754 (3rd Cir. 1979), *enforcing*, 487 F.Supp. 638 (W.D.Pa.1980); *Miller v. Carson*, 401 F.Supp. 835, 897 (M.D.Pa.1975), *aff'd*, 563 F.2d 741 (5th Cir. 1977); *Rodriguez v. Jiminez*, 409 F.Supp. 582, 594 (D.P.R.1976), *aff'd* 537 F.2d 1 (1st Cir. 1976), 557 F.2d 877 (1st Cir. 1977); *Hamilton v. Love*, 328 F.Supp. 1182, 1196 (E.D.Ark.1971), *enforced*, 358 F.Supp. 338 (E.D.Ark.1973), *modified*, 361 F.Supp. 1235 (E.D.Ark.1973); *Jones v. Wittenberg*, 330 F.Supp. 707, 715 (N.D.Ohio 1971), *aff'd sub nom., Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972), *enforced*, 440 F.Supp. 60 (N.D. Ohio 1977).

**33.** *See, e.g.*, cases cited *supra*, note 30.

**34.** *See, e.g., Dimarzo v. Cahill*, 575 F.2d 15, 19 (1st Cir. 1978), *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978); *Laamon v. Helgemoe*, 437 F.Supp. 269, 326–27 (D.N.H. 1977); *Ramos v. Lamm*, 485 F.Supp. 122, 155 (D.Col.1979).

**35.** *See Complex Enforcement: Unconstitutional Prison Conditions*, 94 Harv.L.Rev. 626, 631 (1981). Court orders mandating the upgrading of prison and jail staffs have required a plethora of factors, including training, recruitment, bilingualism, cultural attributes, race and sex, to be accounted for in the fashioning of remedies. *See, e.g., Ahrens v. Thomas*, 434 F.Supp. 873 (W.D.Mo.1977), *aff'd and modified*, 570 F.2d 286 (8th Cir. 1978); *Barnes v. Government of the Virgin Islands*, 415 F.Supp. 1218 (D.V.I. 1976); *Pugh v. Locke*, 406 F.Supp. 318 (M.D. Ala.1976), *aff'd in part and remanded in part sub nom., Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *cert. denied, sub nom., Alabama v. Pugh*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).

**36.** The court notes parenthetically that plaintiffs assert that defendants have failed to take special efforts to recruit and employ black staff members. Plaintiffs argue that this constitutes discrimination on the basis of race proscribed by 42 U.S.C. § 1981. Plaintiffs' standing to pursue such a claim is doubtful, *see Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 234–37, 90 S.Ct. 400, 403–04, 24 L.Ed.2d 386 (1969). In any event, inasmuch as the record is not sufficiently developed to permit a finding of discriminatory intent in or discriminatory impact

shall accordingly submit a plan to upgrade the staffing in accordance herewith.

The adoption of a system of classification is likewise a matter committed to the discretion and expertise of the defendants. At a constitutional minimum, however, defendants must adopt some system of classifying and housing prisoners to assure that a prisoner's propensity for violence as well as an inmate's emotional and physical health be accounted for so as to minimize the risk of harm from fellow inmates to which the prisoners are now exposed. As required by state law, the defendants are also obligated to see that pre-trial detainees are not housed with convicted prisoners. The defendants shall submit a plan to implement a system of classification accordingly.

The court's findings regarding the risk of fire at the jail and the steps necessary to ameliorate the risk are documented in the regulatory violations specified in the various fire safety inspection reports of the West Virginia State Fire Marshal's Office of record. The State Fire Commission regulations initially promulgated in 1976 adopt the National Fire Code and the National Building Code, with some added provisions. In *Teller v. McCoy*, 253 S.E.2d 114, 120 (W.Va.1978), the West Virginia Supreme Court of Appeals recognized that these regulations have the force and effect of state law. As such, the regulations constitute "a valuable reference for what is minimal for human habitation in the public view, thus serving as an indicator of 'evolving notions of decency ....'" *Williams v. Edwards*, 547 F.2d 1206, 1214 (5th Cir. 1977). Defendants shall accordingly submit a plan to alleviate the risk of fire at the jail based upon the cited deficiencies and regulatory standards contained in the fire safety inspection reports of the West Virginia State

Fire Marshal's Office issued on and after July 7, 1980.

## F. Overcrowding

In *Bell v. Wolfish* the Supreme Court recognized that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether these conditions amounted to punishment ...." 441 U.S. at 542, 99 S.Ct. at 1875. Under the totality of conditions presented in *Wolfish*, however, the confining of two pre-trial detainees who were generally not imprisoned in excess of sixty days in a seventy-five square foot cell for seven and a half hours per day did not in the Court's view constitute punishment.

The courts have reached varying results on the question of whether, under the totality of conditions, a crowded cell in a given institution constitutes an unconstitutional condition. This is illustrated in two post-*Wolfish* decisions applying the Fourteenth Amendment punishment standard to county jails. In *Jordan v. Wolke*, 615 F.2d 749 (7th Cir. 1980), the court considered the confinement of four prisoners in a ninety square foot cell with day access to a corridor (400 square feet) and day room (335 square feet), resulting in an area per inmate in each cell block of fifty-nine square feet. Nearly all pre-trial detainees, constituting eighty per cent of the jailhouse population, were released on the average in less than sixty days. The court held the facts before it to be nondistinguishable from those presented in *Wolfish*, stating that "the facilities here were designed for the number of occupants they now contain, and, while that design is not generous with space, it hardly results in punishment in view of the temporary na-

---

resulting from defendants' hiring practices, *see Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), *and Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the court declines to afford plaintiffs the specific relief sought. It is nevertheless observed that a ra-

cially balanced staff would undoubtedly tend to ameliorate any racial tension which may exist between the jail's staff and prisoners. It is suggested that defendants take this factor into account in fashioning programs for the hiring and recruitment of additional staff.

ture of detention at the jail." 615 F.2d at 753.

A different result was reached in *Campbell v. Cauthron*, 623 F.2d 503 (8th Cir. 1980), where pre-trial detainees were ordinarily locked in their cells twenty-four hours per day. The cells, one containing 143 square feet and four others containing 130 square feet, contained eight bunks (with the exception of one which contained six bunks). The average number of detainees in each cell in 1971 was approximately five. The court found these facts readily distinguishable from those presented in *Wolfish* and held the condition violative of the due process clause as follows:

> In *Bell*, by a 5 to 3 vote, the Supreme Court held that double bunking in a seventy-five-square-foot room was not violative of due process. Unlike the situation in this case, however, the rooms in the facility in question in *Bell* were used only for sleeping; the inmates were generally locked in their rooms only between 11:00 p. m. and 6:30 a. m. and were free to move between their rooms and common areas during the rest of the day. The common areas contained a wide variety of exercise and recreational equipment. As the Supreme Court noted, the facility "differs markedly from the familiar image of a jail; there are not barred cells, dank, colorless corridors, or clanging steel gates." *Id.* [441 U.S.] at 525, 99 S.Ct. at 1866.

b. *Remedy*

Because the Sebastian County jail is unconstitutionally overcrowded, we have no alternative but to require that the overcrowding be eliminated. The record here is so complete, the violation so clear, and the precedent so compelling, that this Court can determine without remand the maximum number of inmates that may be held in each cell without contravening constitutional standards. In determining maximum occupancy, we consider that most inmates are confined in the jail for relatively short periods of time. Thus, the requirements are less stringent than they would be if this were a long-term facility. *See Hutto v. Finney, supra,* 437 U.S. at 686, 98 S.Ct. at 2572. ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."). Accordingly, we hold that for those inmates who are confined to their cells for more than sixteen hours per day, the maximum number of inmates and bunks in each of the 130 to 154-square-foot cells shall be four. For those inmates who are held under such conditions for more than one week, the maximum number shall be three. Comparable space per inmate shall be allotted to those housed in the few cells that are larger or smaller than the normal 130 to 154-square-foot size. 623 F.2d at 507.[37]

The consideration of the constitutionality of limited cell space under a given set of conditions must obviously be a pragmatic inquiry. The court must look not simply to the fact of overcrowding but to the "aggregate effect" of overcrowding and consider whether the condition has reached "such proportions that the impact of the aggregate effect amounts to cruel and unusual punishment." *Johnson v. Levine,* 588 F.2d 1378, 1381 (4th Cir. 1978).

In the Mercer County Jail overcrowding in the county, federal and city cells does occur, yet the condition is more an abberation than the norm. Each cell measures eight feet by twelve feet (96 square feet). The prisoners have access between the hours of 7:00 a. m. and 11:00 p. m. to a 540 square foot dayroom for those cells adjacent to the county side or a 416 square foot dayroom for the cells adjacent to the federal and city sides.

The evidence supports the conclusion that overcrowding in the county, feder-

---

**37.** The court also held that the housing of up to eight convicted prisoners in cells containing 140 and 154 square feet was violative of the Eighth Amendment.

al and city cells occurs on an incidental basis. When coupled with the relatively short periods of incarceration for the vast majority of the jail's population (ninety per cent of which spend sixty days or less in the jail), and the daily access to dayrooms, the challenged condition does not present the degree of unjustified hardship contemplated in *Wolfish* as constituting punishment. The court observes that the incidental overcrowding in the county, federal and city cells should be significantly reduced, if not eliminated, by the court's holdings respecting the upgrading of plumbing and the adoption of a classification system. Moreover, if the number of prisoners housed in the 8-bunk 96-square foot cells (plus the 416 to 540-square foot dayrooms) on the county, federal and city sides were limited to four inmates at virtually all times, the space per prisoner would approximate that found adequate for pretrial detainees in the post-*Wolfish* case of *Jordan v. Wolke*, 615 F.2d 749 (7th Cir. 1980), discussed *supra* at 1294.

As a natural corollary to the conclusion that cell crowding in the county, federal and city cells does not constitute a violation of the Fourteenth Amendment as applied to pre-trial detainees, neither does this same condition constitute a violation of the Eighth Amendment rights of convicted prisoners. The court's findings demonstrate, however, that pre-trial detainees are randomly housed with convicted prisoners and that convicted prisoners are often housed more than one to a cell. This practice is violative of W.Va.Code § 7–3–2 (Replacement Vol. 1976), as noted *supra* at 76.[38] Defendants shall accordingly submit a plan providing that convicted prisoners be housed in cells separate from each other, and from the other prisoners.[39]

Of greater concern is the overcrowding demonstrated in the record with respect to the juvenile, side and sweat cells. These cells, used for purposes of administrative segregation and the housing of female prisoners, are without access to a dayroom.[40] Consequently, the prisoners there confined have little opportunity to stretch their legs beyond the limits of their cells.[41] The cells have little or no access to daylight and, as with the entire jail population, there is no opportunity for recreational exercise. The sedentary existence resulting from the totality of the substandard physical conditions at the Mercer County Jail is exponentially increased for those prisoners housed in the side, sweat and juvenile cells without access to a dayroom. *See Campbell v. Cauthron*, 623 F.2d 503, 506 (8th Cir. 1980) (and the cases cited at 506). Indeed, the overcrowding of these cells is a product of other inadequacies at the jail, particularly the neglected state of much of the plumbing, which render otherwise vacant cells unuseable.[42]

The court concludes that under the due process analysis articulated in *Bell v.*

---

38. W.Va.Code § 7–3–2 (Replacement Vol. 1976) provides as follows:

 The jails shall be well secured, and sufficient for the convenient accommodation of those who may be confined therein, and so that the convicts may be in apartments separate from each other, and from the other prisoners; every apartment shall be so constructed that it can be kept comfortable.

39. Defendants are presently in compliance with this requirement to the extent that misdemeanants granted trusty status are housed individually in the trusty cells.

40. As previously noted in the court's findings, the three side cells each measure 11 feet by 12 feet (132 square feet), the four sweat cells each measure 5 feet by 7 feet (35 square feet), and the four juvenile cells each measure 14 feet by 7 feet (94 square feet).

41. These infrequent opportunities are generally limited to the shower, familial and attorney visits, and court appearances.

42. Notice has previously been taken by the courts in prison cases of the fact that minimum space to call one's own is a primary psychological necessity. *See Battle v. Anderson*, 564 F.2d 388, 395 (10th Cir. 1977), *remanded*, 594 F.2d 786 (10th Cir. 1979), *aff'd*, 614 F.2d 251 (10th Cir. 1980); *Johnson v. Levine*, 450 F.Supp. 648, 656 (D.Md.1978), *modified*, 588 F.2d 1378 (4th Cir. 1978).

*Wolfish*, the housing of more than one person in each of the 35-square foot sweat cells constitutes an imposition of undue hardship and, as such, is punishment as applied to pre-trial detainees.[43] Moreover, this is not a condition as contemplated in *Wolfish* where double celling is a function of the defendants' interest in "maintaining security and order and operating the institution in a manageable fashion." 441 U.S. at 540, n.23, 99 S.Ct. at 1875, n.23. Rather, it is a product of the general neglect evidenced in the upkeep and maintenance of the jail and the consequent reduction in useable cell space. As applied to convicted prisoners, double celling in the 5′ × 7′ sweat cells constitutes a deprivation of minimally adequate shelter as judged by even the most parsimonious contemporary standards.[44]

Whether double celling is permissible in the 94-square foot juvenile cells and whether triple celling may be sanctioned in the 132-square foot side cells is dependent on the purpose and length of the confinement, together with such provision as may be made for exercise, recreation, bathing and sunlight exposure outside the cell.

The court holds that the housing of more than one prisoner in the sweat cells, more than two in the juvenile cells and more than three in the side cells is punitive and violative of the Fourteenth Amendment as applied to pre-trial detainees and is violative of the Eighth Amendment as being inadequate shelter when applied to convicted prisoners. If more than one prisoner is to be housed in any of the juvenile cells and if more than two prisoners is to be housed in any of the side cells, defendants shall submit a plan setting forth the purpose and maximum length of confinement of the occupants and the minimum extent to which each occupant shall be entitled to receive exercise, recreation, bathing and sunlight exposure outside the juvenile and side cells.

■ The court's findings with respect to the drunk tank disclose that it is on occasion overcrowded to such a severe degree that the intoxicated prisoners there confined can barely move.[45] However, in light of the generally short duration of drunk tank lock-up, as well as the improvement to be realized in the totality of conditions from the court's holdings regarding jail staffing, classification, housekeeping and medical screening,[46] the use of the drunk tank would not constitute punishment under the *Wolfish* standard if the maximum number of prisoners housed there at any one time is substantially reduced, a system of ventilation is installed and seating is provided so as not to require prisoners to sit on the floor. Defendants shall submit a plan regarding drunk tank use accordingly.[47]

### G. Nutrition

■ Food sufficient to meet minimum nutritional needs is a basic necessity of life. The failure to provide adequate and sanitary food service facilities and to serve food sufficient to meet minimum nutritional

---

**43.** As previously indicated, the sweat and juvenile cells are frequently used to segregate prisoners for the purpose, among others, of punishment.

**44.** A sixty-square foot minimum per prisoner was testified to by plaintiffs' expert. A like minimum has been adopted as the constitutionally permissible minimum in a number of pre-*Wolfish* lower federal court decisions. *See, e.g., Battle v. Anderson,* 564 F.2d at 395; *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd in part and remanded in part sub. nom., Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), *cert. denied sub nom., Alabama v. Pugh,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).

**45.** With sixteen prisoners in the drunk tank, there is a little over eight square feet per prisoner.

**46.** Addressed *infra* at 1306–08.

**47.** The court notes that in a letter from defendants' counsel filed on March 10, 1981, it is stated that the Sheriff has, in keeping with the court's order of November 5, 1980, discontinued the use of the drunk tank as of February 1, 1981, and that in most cases intoxicated individuals are immediately integrated into the general jail population.

needs may give rise to a constitutional deprivation. *See Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980); *Bolding v. Holshouser*, 575 F.2d 461, 468 (4th Cir. 1978), *cert. denied*, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978); *Dimarzo v. Cahill*, 575 F.2d 15, 19 (1st Cir. 1978), *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978).

The cumulative impact of the inadequacies in storage, preparation and serving of food at the jail as documented in the court's findings constitutes a serious hazard to the physical health of the prisoners. Although plaintiffs have not submitted evidence of individual prisoners who have become seriously ill as a result of the food, the total picture painted by the facts surrounding the provision of food confirms the existence of a purposeless threat to the health of a prisoner incarcerated in the jail over an extended period.

■ Defendants have not presented any evidence of the existence of a legitimate government goal promoted by the inferior quality of the food service at the jail. Indeed, this condition appears violative of defendant commissioners' state statutory duty under W.Va.Code § 7–8–2a (Replacement Vol. 1976) to "provide wholesome and sufficient food . . . for all persons confined in the county jail." [48] The totality of conditions relating to the storage, preparation and service of food constitutes an unjustifiable threat to the physical well-being of all the prisoners, is punitive as to long term pre-trial detainees and is violative of the Eighth Amendment as to long term convicted prisoners. Defendants shall accordingly submit a plan assuring that the food service is operated in a sanitary manner and that the food served is sufficient to meet the nutritional needs of the prisoners in keeping herewith.

## H. Exercise

Undue restrictions on prisoners' opportunities for physical exercise may constitute cruel and unusual punishment in violation of the Eighth Amendment when they pose an unreasonable threat to the prisoners' physical and mental health. *See Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980); *Kirby v. Blackledge*, 530 F.2d 583, 586 (4th Cir. 1976); *Rhem v. Malcolm*, 507 F.2d 333, 337 (2d Cir. 1974), *enforced*, 377 F.Supp. 995 (S.D.N.Y.1974), *aff'd*, 527 F.2d 1041 (2d Cir. 1975), *enforced*, 432 F.Supp. 769 (S.D.N.Y. 1977).

In *Clay v. Miller, supra*, plaintiff challenged the sheriff's failure to provide plaintiff any exercise opportunities during his five-month stay in the Halifax County Jail. Plaintiff was confined in his cell for six hours per day and had access to a dayroom during the remaining eighteen hours. In affirming the district court's entry of summary judgment as against plaintiff's damage claim,[49] the court described the determination of whether the failure to provide exercise opportunities constitutes a constitutional deprivation as follows:

In deciding whether conditions at a jail are so onerously burdensome as to reach constitutional dimensions, courts must look at the totality of the circumstances, including the extent to which the restrictions adversely affect the mental or physical health of the inmate. *See, e. g., Dorrough v. Hogan*, 563 F.2d 1259, 1263 (4th Cir. 1977), *cert. denied*, 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 153 (1978). *See also Kirby v. Blackledge, supra.* There has been no showing that Clay's mental or physical health was threatened as a result of not being provided more space or facilities than that provided by the day room area. We agree with the district court that the conditions at Halifax

---

**48.** In addition, the failure to require all prison employees and trusties who work in the kitchen to obtain food handlers' licenses is violative of Chapter 2, section 30, of the regulations of the West Virginia Department of Health.

**49.** Plaintiff's claim for injunctive relief had been mooted by his release from the jail. *See* 626 F.2d at 347.

County Jail satisfy minimum constitutional standards.

626 F.2d at 347.

The need to analyze the totality of conditions in considering the question of exercise opportunities was likewise emphasized in *Campbell v. McGruder*, 580 F.2d 521 (D.C. Cir.1978):

> Paragraph 3 [of the district court's order] requires the defendants to "[p]rovide at least one hour of outdoor recreation daily for each resident of the Jail."
>
> We note, first, that although there was sufficient evidence before the District Court to sustain the conclusion that the absence of recreation would be likely to impair the mental or physical health of the pretrial detainees, *see, e. g.,* Trial Tr. at 225; *cf. Rhem v. Malcolm,* 371 F.Supp. 594, 611, 627 (S.D.N.Y.), *affirmed and remanded,* 507 F.2d 333 (2d Cir. 1974); there was no evidence about the necessity for *outdoor* recreation. The District Court may have had in mind the absence of indoor facilities at the old Jail for vigorous physical exercise. J.A. at 297–302. In that case, however, paragraph 3 ought to have been addressed to the *quality* of recreation defendants should be required to make available, rather than to its *location.* At the NDF, for example, indoor recreation facilities include a mini-gymnasium where inmates can play basketball and handball. 29 Apr. Tr. at 110. On the other hand, the District Court may have had in mind the salutary effects of exposure to fresh air and sunshine. Other courts seem to have come to this conclusion, but there is insufficient evidence on this record to sustain it. On remand, the District Court should determine the quality and kind of recreational opportunities that must be afforded members of the plaintiff class in order to protect their mental and physical health. This will depend upon what other recreational opportunities are available at a particular facility, and it may be affected by temporal factors such as the duration of a detainee's pretrial incarceration.

580 F.2d at 544–46 (footnotes omitted).

Similar analyses were employed in *Rhem v. Malcolm,* wherein the court affirmed the district court's order mandating the provision of regular opportunities for exercise for pre-trial detainees who were locked in their cells sixteen hours per day and who had been provided fifty minutes of exercise per week;[50] and in *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854 (4th Cir. 1975), wherein the court stated:

> While a restriction of two exercise periods of one hour each during a week, as allowed the plaintiff, may not ordinarily transgress the constitutional standard as fixed by the Eighth Amendment if confined to a relatively short period of maximum confinement, the rule may be quite different when, as here, the restriction has extended already over a period of years and is likely to extend indefinitely for the balance of plaintiff's confinement. Such indefinite limitation on exercise may be harmful to a prisoner's health, and, if so, would amount to "cruel and unusual" punishment. This issue was apparently not addressed either by the parties or by the Court. We accordingly feel constrained because of the extended period of plaintiff's confinement in maximum security to remand the cause to the District Court in order that it may take additional testimony and consider in greater detail whether the health of the plaintiff may be adversely affected by the restricted exercise rights accorded him and whether it is not practical for the prison authorities to provide him with more exercise opportunities. If the prisoner's health is being affected or it is practical for the prison authorities to grant additional exercise time to the plaintiff, without unduly imperilling security or without making unreasonable

---

50. The district court subsequently ordered that prisoners be afforded a minimum of one hour of exercise five days per week. *See Rhem v. Malcolm,* 389 F.Supp. 964, 972 (S.D.N.Y.1975).

administrative difficulties for the prison authorities, the prisoner's constitutional rights, it would seem, are implicated. 529 F.2d at 866.[51]

The quoted excerpts share the common premise that in considering the totality of conditions pertinent to the right of exercise at a given institution, elements including the overall duration of incarceration, the length of time for which prisoners are locked in their cells each day, the size and suitability of dayroom space for exercise, and the practical opportunities for the institution to provide prisoners with increased exercise opportunities must be considered. Moreover, special consideration must be given to "the extent to which the [existing] restrictions adversely affect the mental or physical health of the inmate." *Clay v. Miller*, 626 F.2d at 347.

Prisoners incarcerated in the Mercer County Jail are provided no opportunities for exercise. As has been noted, prisoners housed in the county, federal, city and trusty cells, spend eight hours per day in their cells with access to a dayroom for the remaining sixteen hours. The dayrooms are not equipped with recreational equipment, nor do the defendants otherwise encourage exercise. Prisoners housed in the side, sweat and juvenile cells have no dayroom access. The county dayroom (12 feet by 45 feet), the city and federal dayrooms (13 feet by 32 feet), and the trusty dayroom

(12 feet by 24 feet) are physically small and, when considered together with the furniture and the number of prisoners, do not provide sufficient space to permit vigorous exercise. It is further observed that direct sunlight in the jail is scant at best.

The consideration of whether the total absence of exercise opportunities at the Mercer County Jail threatens the mental and physical health of prisoners is made difficult by the lack of evidence of actual injuries incurred as a result. The totality of conditions already discussed, however, demonstrate that the environment of the jail is dark, cramped and stagnant.[52] The lack of any significant physical or intellectual stimulus at the jail, coupled with the extended periods for which some of the prisoners are locked in their cells, leads to the conclusion that such prisoners are seriously threatened by the bodily harm described by plaintiffs' expert witnesses due to defendants' failure to provide any exercise opportunities.

Under the totality of conditions, the failure to provide any opportunity for exercise constitutes a serious and unnecessary threat to the physical well-being of the prisoners. Defendants' interests in security and the efficient management of the jail are, no doubt, furthered by the no-exercise policy. But the failure to make available any exercise is surely an exaggerated response to these interests when considered in

---

**51.** *See also Campbell v. Cauthron*, 623 F.2d 503 (8th Cir. 1980), involving pre-trial detainees imprisoned in a county jail who were locked in their cells twenty-four hours per day:

> [T]o prevent enforced idleness resulting in the type of physical denigration described in the record, each inmate that is confined in his cell for more than sixteen hours shall ordinarily be given the opportunity to exercise for at least one hour per day outside the cell. The determination of the type of exercise equipment and facilities available for this purpose shall be within the discretion of jail officials, subject to the approval of the district court. They must, however, provide a meaningful opportunity for exercise. Merely allowing the inmate to walk around in the narrow corridor between the cells does not provide adequate exercise.

623 F.2d at 507.

**52.** In contrast, the Metropolitan Correctional Center which was at issue in *Bell v. Wolfish* was described as follows:

> The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was intended to include the most advanced and innovative features of modern design of detention facilities. As the Court of Appeals states: "[I]t represented the architectural embodiment of the best and most progressive penological planning."

*441 U.S. at 525, 1866.*

the light of the deadening conditions present at the jail. *See Bell v. Wolfish,* 441 U.S. at 540–41, n.23, 99 S.Ct. 1875, n.23. The court concludes that the failure to provide any opportunity for exercise at the jail for prisoners incarcerated in excess of thirty days without reasonably consistent dayroom access constitutes a violation of the Fourteenth Amendment as applied to pretrial detainees and the Eighth Amendment as applied to convicted prisoners. Whether and to what extent exercise opportunities should also be furnished other prisoners with dayroom access who have been incarcerated for periods longer than thirty days is a matter for further consideration in the light of steps that may be taken by the defendants in reducing cell crowding, enhancing nutrition, improving sunlight exposure and increasing reading and related recreational options.

The determination of the frequency and type of exercise opportunities which can be made available, and whether indoor or outdoor or both, is a matter within the province and expertise of defendants. Notice has previously been taken in the court's findings, however, of the Vitamin D deficiencies experienced at the jail due to the diet and the lack of exposure to direct sunlight. Moreover, in the absence of a modification of the present internal design of the jail, the space available is inadequate for the provision of meaningful exercise. Accordingly, in reporting to the court, defendants are directed to address the feasibility of both indoor and outdoor exercise and the duration and frequency with which such exercise can be made available for those incarcerated in excess of thirty days.

## I. Discipline

Plaintiffs challenge defendants' failure to promulgate written rules regarding discipline and the failure to provide procedural safeguards when disciplinary action is taken against prisoners as violative of the Due Process Clause of the Fourteenth Amendment. Plaintiffs cite, and the record reveals, five specific disciplinary measures utilized at the jail which are imposed without prior notice or hearing: The forfeiture of good time, segregated confinement, confiscation of books, forfeiture of trusty status, and the denial of visitation rights.

1.

Procedural due process analysis is a twofold inquiry. First, the court must consider whether a protected liberty or property interest is implicated in the challenged state action. If so, the court must then determine what process is due before the aggrieved party's protected interest may be infringed or deprived. *See Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The determination of whether an asserted liberty or property interest is of constitutional stature in the context of prison discipline has been the subject of several recent Supreme Court decisions. In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court held that a state prisoner was entitled to a written notice, a hearing before an impartial tribunal, a limited right to call witnesses, and written findings by the tribunal in the context of a disciplinary proceeding for serious misconduct in which the prisoner faced the prospective loss of good time credits.[53] The Court premised its finding of a protected liberty interest on a state statute which specified that the statutory right to good time could only be forfeited for serious misbehavior. Thus, the liberty interest recognized in *Wolff* was a creation of state law. As such, the state was not free to deprive prisoners of the right to good time without affording procedural due process safeguards "to insure that the state-created right is not arbitrarily abrogated." 418 U.S. at 557, 94 S.Ct. at 2975.

The Court reached a contrary result, though employing the same due process

---

**53.** The Court indicated that the imposition of solitary confinement as punishment for serious misconduct also implicated a protected liberty interest requiring the same procedural due process safeguards. 418 U.S. at 571–72, n.19, 94 S.Ct. at 2982, n.19.

analysis, in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). In *Meachum*, a state prisoner challenged his transfer to another prison of substantially less favorable conditions following a finding by the prison classification board that the prisoner had been involved in a rash of fires at the prison. Petitioner contended that the fact-finding hearing afforded him was inadequate in that it did not comport with the procedural safeguards enunciated in *Wolff*.

The Court rejected the proposition that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause. In contrast to *Wolff*, the transfer of prisoners between Massachusetts prisons was not subject to state statutory conditions. "On the contrary, transfer in a wide variety of circumstances is vested in prison officials. The predicate for invoking the protection of the Fourteenth Amendment as construed and applied in *Wolff v. McDonnell* is totally nonexistent in this case." 427 U.S. at 227, 96 S.Ct. at 2540. The court concluded its opinion as follows:

> Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all.

> Holding that arrangements like this are within reach of the procedural protections of the Due Process Clause would place the Clause astride the day-to-day functioning of state prisons and involve the judiciary in issues and discretionary decisions that are not the business of federal judges. We decline to so interpret and apply the Due Process Clause. The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States. *Preiser*

*v. Rodriguez*, 411 U.S. 475, 491–492 [93 S.Ct. 1827, 1837, 36 L.Ed.2d 439] (1973); *Cruz v. Beto*, 405 U.S. 319, 321 [92 S.Ct. 1079, 1081, 31 L.Ed.2d 263] (1972); *Johnson v. Avery*, 393 U.S. 483, 486 [89 S.Ct. 747, 749, 21 L.Ed.2d 718] (1969). The individual States, of course, are free to follow another course, whether by statute, by rule or regulation, or by interpretation of their own constitutions. They may thus decide that prudent prison administration requires pretransfer hearings. Our holding is that the Due Process Clause does not impose a nationwide rule mandating transfer hearings.

427 U.S. at 228–29, 96 S.Ct. at 2540 (footnote omitted); *compare Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980).

■ Under the rationale employed in *Wolff* and *Meachum*, the Due Process Clause of the Fourteenth Amendment does not, by its own force, create liberty interests for prisoners in the various and sundry conditions of confinement imposed following a lawful conviction. Rather, it is the statutes, rules, regulations, mutually explicit understandings and court interpretations of the individual states which must be looked to in determining whether a prisoner's liberty or property interests have been unduly infringed in the course of the day to day decisions made by prison managers. *See Bills v. Henderson*, 631 F.2d 1287, 1291 (6th Cir. 1980); *Walker v. Hughes*, 558 F.2d 1247, 1255 (6th Cir. 1977); *Cooper v. Riddle*, 540 F.2d 731, 732 (4th Cir. 1976). If the challenged act is one exercised in good faith, is committed solely to the discretion of prison officials and does not implicate a fundamental constitutional guarantee, it is generally not "within the reach of the procedural protection of the Due Process Clause . . . ." 427 U.S. at 228–29, 96 S.Ct. at 2540; *see also Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir. 1978), *cert. denied*, 435 U.S. 1009, 98 S.Ct. 1882, 56 L.Ed.2d 391 (1978); Note, *A Review of Prisoners' Rights*

*Litigation Under 42 U.S.C. § 1983,* 11 U. of Rich.L.Rev. 803, 880–83 (1977).[54]

2.

Turning first to the question of whether plaintiffs have a protected liberty interest implicated by the loss of good time, as well as the effect of failure to publish rules governing good time loss, the court finds that its inquiry is answered by the West Virginia Supreme Court of Appeals' decision in *State ex rel. Gillespie v. Kendrick,* 265 S.E.2d 537 (W.Va.1980). In *Gillespie* the court construed W.Va.Code § 7–8–11 (Replacement Vol. 1976) which provides for the reduction in sentences of county jail prisoners for good conduct or the donation of blood.[55] The court held that the award of the good time credit created by section 7–8–11 is a nondiscretionary obligation of the sheriff and constitutes a "valuable liberty interest protected by the due process clause." 265 S.E.2d at 540. The court further held that the Fourteenth Amendment and the due process clause in W.Va. Constitution art. III, § 10, require that the rules and regulations which apprise prisoners of

the conduct required for them to earn good time credits must be published and that "[a]lthough a sheriff is not statutorily required to keep records of conduct, the absence of such records will work presumptively in his favor. A county jail prisoner will be presumed to have conducted himself well and ... entitled to the good time credit ... unless he has a recorded history of misconduct." 265 S.E.2d at 542.

■ *Gillespie* constitutes a state court's interpretation of its own constitution and laws as adverted to in *Meachum,*[56] recognizing a state created liberty interest in county prisoners' receipt of good time credits and, as a consequence, the requirement that the rules of conduct affecting the right to good time be published as a matter of procedural due process. The court therefore concludes that defendants must comply with the dictates of *Gillespie* by affording prisoners facing the loss of good time as a disciplinary sanction the procedural safeguards delineated in *Wolff v. McDonnell*[57] and must publish rules of conduct as further required by *Gillespie.* In so doing defendants have the benefit of the manual of rules and

---

**54.** The court observes that the Supreme Court has not precluded the possibility that prisoners may have protected liberty interests originating in the Due Process Clause as evidenced in the following excerpt from *Wolff v. McDonnell*:

> As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court. It is our view, however, that the procedures we have now required in prison disciplinary proceedings represent a reasonable accommodation between the interests of the inmates and the needs of the institution.

418 U.S. at 572, 94 S.Ct. at 2982. Moreover, the Court has not expressly overruled *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), wherein it held that the deprivation of liberty resulting from the revocation of a prisoner's parole constituted a "grievous loss" of sufficient magnitude to warrant the imposition of procedural due process protections.

**55.** W.Va.Code § 7–8–11 (Replacement Vol. 1977) provides *in toto* that:

> Every prisoner sentenced to the county jail for a term exceeding six months who, in the

judgment of the sheriff, shall faithfully comply with all rules and regulations of said county jail during his term of confinement shall be entitled to a deduction of five days from each month of his sentence.

In addition to the foregoing, every prisoner who desires to and does donate blood to any person, agency, organization, corporation or association as may be approved by the sheriff, shall be entitled to a deduction of five days from his sentence for each pint of blood so donated.

**56.** 427 U.S. at 229, 96 S.Ct. at 2540.

**57.** The procedural safeguards of *Wolff* are incorporated by implication in *Gillespie.* Moreover, *Gillespie,* which involved a convicted prisoner incarcerated in the Mercer County Jail, collaterally estops defendants from relitigating this issue in the case at bar. *See Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Crowe v. Leeke,* 550 F.2d 184 (4th Cir. 1977); 1B J. Moore, *Federal Practice* ¶ 0.441[2] at 3375–80 (2d ed. 1974).

regulations which were appended to the court's opinion in *Gillespie* and which were characterized by the Supreme Court of Appeals as "an excellent example of jail regulations designed to protect both prisoner and government interests," 265 S.E.2d at 542, n.5.

### 3.

■ Plaintiffs are similarly endowed with a constitutionally protected liberty interest in instances in which they are subject to administrative segregation akin to punishment. The testimony of the defendant sheriff, his staff, and current and former prisoners as of the time of trial establishes that administrative segregation has been utilized as punishment for serious misconduct in the jail as a matter of custom. This customary practice falls within the class of unwritten rules and mutually explicit understandings adverted to in *Perry v. Sinderman*, 408 U.S. 593, 601, 92 S.Ct. 2694, ——, 33 L.Ed.2d 570 (1972), giving rise to a protected liberty interest. As such, defendants must afford prisoners the procedural protections delineated in *Wolff* prior to committing a prisoner to administrative segregation.

In *Tasker v. Griffith*, 238 S.E.2d 229 (W.Va.1977), the West Virginia Supreme Court of Appeals held that:

> [B]efore placing an inmate in administrative segregation, the prison authorities must advise him that he is under investigation for misconduct. The inmate should be advised of the specific offense under investigation, unless the prison authorities in their discretion determine that such disclosure could adversely affect the integrity of the investigation. When the investigation is concluded, the authorities must advise the inmate whether he was exonerated or whether

formal disciplinary proceedings will be instituted. At this point the inmate should receive an explanation of the charges against him, if such an explanation has not already been provided. Finally, the prison officials must have specific reasons for determining that effective investigation of the charges requires the isolation of the inmate involved. If no specific reason for isolation can be articulated, administrative segregation is inappropriate and should not be imposed. We are speaking now of solitary confinement, or at least close confinement; if administrative segregation is accomplished under less restrictive circumstances, it may be used for other reasonable purposes. We are concerned here only with something which looks and feels like punishment but which is denominated "administrative segregation."

238 S.E.2d at 234.[58]

Several aspects of *Tasker* are worthy of special note in relation to the question of whether it constitutes an independent recognition of a protected liberty interest relative to the imposition of administrative segregation. First, the West Virginia Supreme Court did not specify whether it was relying on state constitutional, state statutory or state regulatory law in recognizing a protected liberty interest implicated when a prisoner is placed in administrative segregation where he or she is under investigation for misconduct. The court takes notice that, as cited in *Tasker*, 238 S.E.2d at 235, the Huttonsville Correctional Center has adopted rules governing the disciplining of inmates. Although this may, at first blush, appear to be a basis for distinguishing *Tasker* from the case at bar (wherein no rules have been adopted), it must be recalled that under *Gillespie* defendants have a state constitutional obligation to adopt such rules prior to the deprivation of good

---

**58.** The court further held that in order to insure that the "easier-accomplished administrative segregation does not become a substitute for disciplinary isolation . . ., ordinarily no inmate can be confined in administrative segregation more than one time for an investigation into each charge of misconduct, and the confinement cannot exceed three days." 238 S.E.2d at 234.

time credits. Thus, the absence of behavioral rules similar to those adverted to in *Tasker* does not diminish its applicability here; once defendants adopt regulations governing prisoner conduct as they must under *Gillespie*, *Tasker* requires that procedural due process safeguards accompany the imposition of administrative segregation appurtenant to an investigation for misconduct.

Next, *Tasker* is by its facts limited to the issue of the procedural safeguards due when a prisoner is placed in administrative segregation while under investigation for misconduct. It follows from the West Virginia Supreme Court's holding, however, that a protected liberty interest is implicated in the use of administrative segregation as a disciplinary measure generally. *See* 238 S.E.2d at 233. The procedural due process safeguards announced in *Tasker* are presented as safeguards which are preliminary to those required by *Wolff v. McDonnell. See also Watson v. Whyte*, 245 S.E.2d 916, 918 (W.Va.1978). Thus, the liberty interest recognized in *Tasker* requires application of the procedural safeguards enunciated in *Wolff* to those instances where a prisoner is committed to administrative segregation as a form of punishment for serious misconduct.

The court accordingly holds that prisoners in the Mercer County Jail placed in administrative segregation for purposes of an investigation or as a consequence of a formal charge of misconduct, enjoy a state created liberty interest which activates the procedural protections mandated by *Tasker* and *Wolff.*

### 4.

 There is no West Virginia statutory or decisional law governing the taking away of trusty status as a disciplinary measure. Since *Meachum*, the federal courts have generally held that in the absence of a state created liberty interest,

changes in a prisoner's classification do not implicate a protected liberty interest and, therefore, procedural due process safeguards are not applicable. Thus, in *Altizer v. Paderick*, 569 F.2d 812 (4th Cir. 1978), *cert. denied*, 435 U.S. 1009, 98 S.Ct. 1882, 56 L.Ed.2d 391 (1978), the court held that the removal of a prisoner's privileges as an "inmate counselor" without a fact finding hearing did not implicate a constitutionally protected interest, stating that:

> In particular, the classifications and work assignments of prisoners in such institutions are matters of prison administration, within the discretion of prison administrators, and do not require fact-finding hearings as a prerequisite for the exercise of such discretion.

569 F.2d at 812–13; *see also Moody v. Daggett*, 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 279 n.9, 50 L.Ed.2d 236 (1976); *Cooper v. Riddle*, 540 F.2d 731, 732 (4th Cir. 1976); *Bukhari v. Hutto*, 487 F.Supp. 1162, 1167 (E.D. Va.1980).

The court accordingly concludes that prisoners facing the loss of trusty status at the jail are not entitled to procedural due process safeguards incident to such a potential loss.

### 5.

 Plaintiffs further complain of the failure to provide procedural due process safeguards incident to the deprivation of books and the loss of visitation privileges as disciplinary measures. While under certain circumstances, the deprivation of privileges may implicate the due process clause, *see Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972),[59] the incidental and short-lived deprivations complained of by plaintiffs are too ephemeral to give rise to a protected liberty interest requiring prior notice and hearing. *See Baxter v. Palmigiano*, 425 U.S. 308, 323, 96 S.Ct. 1551, 1560, 47 L.Ed.2d 810 (1976); *Cooper v. Riddle*, 540 F.2d at 732. The court never-

---

**59.** *See also Berch v. Stahl*, 373 F.Supp. 412, 422–23 (W.D.N.C.1974); *Craig v. Hocker*, 405

F.Supp. 656, 662 (D.Nev.1975).

theless observes that the rules promulgated by defendants pursuant to *Gillespie* should work to diminish the unduly arbitrary deprivation of privileges.

## J. Medical Care

■ The contours of the Eighth Amendment's proscription of the failure to provide medical care to prisoners were delineated in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), as follows:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," *In re Kemmler*, [136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519] *supra*, the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. Cf. *Gregg v. Georgia, supra*, [428 U.S.] at 182–183 [96 S.Ct. at 2929–30] (joint opinion). The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra*, at 173 [96 S.Ct. at 2925] (joint opinion), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. at 103–05, 97 S.Ct. at 290–91 (footnotes omitted). The *Estelle* standard is generally regarded as two-pronged: It requires deliberate indifference on the part of prison officials and also requires that the prisoner's medical needs be serious. *See West v. Keve*, 571 F.2d 158, 162 (3rd Cir. 1978). Mere negligence, mistake or difference of medical opinion in the provision of medical care to prisoners do not rise to an Eighth Amendment deprivation under the *Estelle* standard. *See Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977); *Lee v. Downs*, 470 F.Supp. 188, 192 (E.D.Va.1979).

The virtually innumerable aspects of incarceration which might give rise to a claim of an Eighth Amendment deprivation has resulted in the application of the *Estelle* standard to situations other than those involving the provision of direct medical treatment. Thus, in *Bowring v. Godwin, supra*, the court, recognizing "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart," held that a prison inmate:

> [I]s entitled to pyschological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial. The right to treatment is, of course, limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable.

551 F.2d at 47–48. The Eighth Amendment has also been held to be implicated when a prison's "inadequate, inaccurate and unprofessionally maintained medical records" give rise to "the possibility for disaster

stemming from a failure to properly chart" medical care received by prisoners. *Burks v. Teasdale*, 492 F.Supp. 650, 676 (W.D.Mo. 1980).

Although the *Estelle* standard is semantically tailored to individual medical care, it has also been applied to systemic deficiencies in the provision of medical care in prisons. Thus, systemic deficiencies manifested by insufficient or unqualified medical personnel, and inadequate medical facilities and procedures in a prison which make unnecessary suffering inevitable may constitute an unconstitutional deprivation. *See Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3rd Cir. 1979); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *Newman v. Alabama*, 503 F.2d 1320, 1330–32 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975).

In the case at bar, the court's findings demonstrate that the provision of medical care is grossly deficient. The haphazard approach to medical care in the jail permeates every facet of the prisoners' medical needs. Upon initial incarceration, prisoners, many of whom are intoxicated or drugged, are medically screened by a staff wholly untrained in the detection of physical or mental illness and unprepared to respond properly. It is generally recognized that prompt medical screening is a medical necessity in pre-trial detention facilities:

For many prisoners, the process of incarceration creates an immediate need for medical care. First, incarceration abruptly cuts off access to all forms of ongoing care. Persons such as epileptics and diabetics, who have an immediate need to continue their treatments, are unlikely to be carrying their medications at the time of arrest. In any case, prisons universally confiscate medications brought in by new convicts. Second, incarceration prevents immediate access to a physician for continuation of ongoing treatment or evaluation of new injuries or problems. At least in pretrial facilities, incarceration frequently commences during the night and weekend hours, when normal sick call services are unavailable. Third, confinement itself creates several health hazards, whether in the form of housing isolation, deprivation of opiates, work assignments, standard diets. By the decision to imprison, the state creates immediate medical needs and thus obligates itself to provide appropriate care.

For these reasons, courts and medical and correctional experts generally agree that some form of prompt medical screening is essential upon entering prison. Neisser, *Is There a Doctor in the Joint? The Search For Constitutional Standards for Prison Health Care*, 63 Va.L.Rev. 921, 963–64 (1977) (footnotes 166–167 omitted).[60]

Coupled with the failure of medical screening, the absence of any classification

---

**60.** Neisser cites in support the following at footnote 168:

See, e.g., *Miller v. Carson*, 401 F.Supp. 835, 878 (M.D.Fla.1975); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 691 (D.Mass.1973), *aff'd*, 494 F.2d 1196 (1st Cir. 1974); *Hamilton v. Landrieu*, 351 F.Supp. 549, 550 (E.D.La.1972); *Jones v. Wittenberg*, 330 F.Supp. 707, 718 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972); *Joiner v. Pruitt*, No. 475–166, slip op. at 3 (Ind.Super.Ct. Feb. 21, 1975); *Wayne County Jail Inmates v. Wayne County Bd. of Comm'rs*, No. 173217, slip op. at 21–22 (Mich.Cir.Ct. May 18, 1971); *Jackson v. Hendrick*, No. 71–2347, slip op. at 33–37, 223 (Pa.Ct. Common Pleas Apr. 7, 1976), *aff'd in part and rev'd in part on other grounds*, 10 Pa.Cmwlth. 392, 309 A.2d 187 (1973), *modified on other grounds*, 457 Pa. 405, 321 A.2d 603 (1974); ABA Standards, *supra*, note 1, at 18 (standards of Nat'l Sheriffs' Ass'n), 41 (standards of the Association of State Correctional Administrators); ACA Standards, *supra* note 158; AMA Standards, *supra* note 156, at 4–7; APHA Standards, *supra* note 96, at 3–6; Nebraska State Bar Association, Minimum Standards for Local Criminal Detention Facilities 182–83 (1977); *Legal Status, supra* note 88, Standard No. 5.4, at 481–84. *But see Todaro v. Ward*, 431 F.Supp. 1129, 1138 (S.D.N.Y.1977), *aff'd*, 565 F.2d 48 (2d Cir. 1977); *Collins v. Schoonfield*, 344 F.Supp. 257, 277 (D.Md.1972). 63 Va.L.Rev. at 964, n.168.

among prisoners inevitably mixes the sick with the healthy. The total absence of medical supplies or a medical room in the jail renders the staff unprepared for medical emergencies which may arise. The absence of sick call procedures, the lack of appreciation of the importance of accurate medical records and accurate dispensation of prescribed drugs, and the failure to provide timely access to medical and psychiatric or psychological personnel assures a modicum of detection, diagnosis and treatment of sickness among the jail's population.

In short, the provision of medical care at the jail is nonsystemic at best, and bespeaks a lack of professionalism and good judgment. Unnecessary and potentially dangerous physical and emotional suffering by at least some among the jail population is assured. The court concludes that the denial of adequate medical screening, classification, record keeping, sick call procedures and timely access to care at the Mercer County Jail constitutes deliberate indifference to the potentially serious medical needs of the pre-trial detainees and convicted prisoners alike in violation of the Eighth Amendment.[61]

In fashioning the remedy to this unconstitutional condition, the court is guided by the oft-stated principle that, in the end, the provision of medical care to prisoners is a matter of sound professional judgment. See Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977), where it was noted that:

> Although courts are ill-equipped to prescribe the techniques of treatment, this does not alter the fact that in many cases treatment is obviously called for and is available in some form. In such cases, the state cannot arbitrarily refuse to provide relief. The exact contours of relief should be left to the sound discretion of experts in the field.

551 F.2d at 48, n.3.

Defendants shall accordingly present a plan for the provision of medical care in keeping herewith.

### K. Visitation

■ The regulation of visitation privileges is generally recognized as a matter committed to the informed discretion and expertise of jail and prison officials. This is reflected in Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), where the Court stated with respect to prison visitation that:

> [I]t is obvious that institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives of the corrections system itself, require that some limitation be placed on such visitations. So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines, "prison officials must be accorded great latitude."

417 U.S. at 826, 94 S.Ct. at 2806.[62] Only when jail or prison practices and conditions regarding visitation transgress the communicational and associational rights of prisoners in an arbitrary, punitive or discriminatory fashion have courts intervened. See, e. g., Lynott v. Henderson, 610 F.2d 340, 342 (5th Cir. 1980) (limitations of visitation may

---

**61.** Courts have generally applied the Estelle Eighth Amendment standard for the provision of medical care to pre-trial detainees and convicted prisoners alike without articulating whether the Fourteenth Amendment requires a heightened level of constitutional scrutiny as to the medical care provided to pre-trial detainees. It has nevertheless been recognized in the medical care context that it would be anomalous to provide pre-trial detainees less constitutional protection than convicted prisoners and that, at a minimum the Estelle "deliberate indif-

ference" standard must be met as to pre-trial detainees as well. See Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3rd Cir. 1979).

**62.** In Pell plaintiffs, consisting of prison inmates and journalists, challenged a state prison regulation which prohibited press and media interviews with individual inmates whom they specifically named and requested to interview.

be imposed only if they are necessary to meet legitimate penological objectives such as rehabilitation and the maintenance of security); *Feeley v. Sampson*, 570 F.2d 364, 372 (1st Cir. 1978) (county jail authorities' failure to issue rules clarifying what amount of visitation would be permitted held arbitrary and capricious where it left each detainee at the whim of the sheriff and his assistants); *Massey v. Wilson*, 484 F.Supp. 1332, 1333 (D.Col.1980) (plaintiff's allegation that visitation privileges were afforded at the whim of prison officials states a claim); *Tunnell v. Robinson*, 486 F.Supp. 1265, 1270–71 (W.D.Pa.1980) (only when visitation is denied in an unreasonable or discriminatory matter does an actionable claim exist); *Valentine v. Englehardt*, 474 F.Supp. 294, 301 (D.N.J.1979) (county jail policy totally barring visitation by prisoners' children held unconstitutional).

The inadequate visitation facilities and the meager visitation opportunities at the jail, though reflective more of indifference than of punitive intent on the part of defendants, are nevertheless arbitrary and purposeless under the *Bell v. Wolfish* standard. Requiring prisoners to shout in order to be heard and to strain to see their visitors through barely translucent glass of minimal dimension finds no justification in a legitimate governmental objective. The substantial evidence in the record discloses a failure on the part of defendants which surpasses the "great latitude" afforded the defendants' discretion regarding visitation. Defendants shall accordingly submit a plan upgrading the visitation facilities and liberalizing the visitation opportunities at the Mercer County Jail.

Plaintiffs further seek the right to contact visitation. While contact visitation has been recognized to be an "appropriate, humane remedy, within the court's constitu-

tional exercise of its judicial power," *Miller v. Carson*, 563 F.2d 741, 749 (5th Cir. 1977), *rehearing en banc denied*, 566 F.2d 106 (5th Cir. 1977), plaintiffs have failed to meet their burden of substantial evidence in demonstrating that the totality of conditions at the jail compels contact visitation as the only constitutionally permissible response. *Compare Jordan v. Wolke*, 615 F.2d 749, 753 (7th Cir. 1980); *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 759–60 (3rd Cir. 1979); *Valentine v. Englehardt*, 492 F.Supp. 1039, 1042–43 (D.N.J.1980); *with Miller v. Carson*, 563 F.2d at 748–49 and n.9; *Wolfish v. Levi*, 573 F.2d 118, 126 n.16 (2d Cir. 1978), *rev'd on other issues sub. nom., Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). This conclusion does not foreclose the use of contact visitation as a remedy in this case should defendants' plan, as presented or as applied, fail to ameliorate the existing conditions. *See Hutto v. Finney*, 437 U.S. 678, 687 n.9, 98 S.Ct. 2565, 2572 n.9, 57 L.Ed.2d 522 (1978).

### L. Mail

#### 1. Outgoing Mail

■ An unreasonable and extended delay or deliberate refusal to post outgoing prisoner mail may constitute a deprivation of a prisoner's First, Sixth and Fourteenth Amendment rights in the absence of a valid interest in the maintenance of security.[63] *See Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Bolding v. Holshouser*, 575 F.2d 461 (4th Cir. 1978), *cert. denied*, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978); *Navarette v. Enemoto*, 536 F.2d 277 (9th Cir. 1976), *rev'd on other grounds sub. nom., Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), *enforcing*, 581 F.2d 202 (9th Cir. 1978). Where, however, as in the instant

---

**63.** The court observes that in the context of the censorship of inmate mail, the Supreme Court stated in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), that "while First Amendment rights may protect against the censoring of inmate mail, when not neces- sary to protect legitimate governmental interests, *see Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), this Court has not yet recognized First Amendment rights of prisoners in this context . . . ." 418 U.S. at 575–76, 94 S.Ct. at 2984.

case, delays in the posting of outgoing mail are incidental and do not extend beyond a day or two, no constitutional concerns arise in the absence of a showing of prejudice or undue burden to the inmates. *See Martin v. Wainwright,* 526 F.2d 938 (5th Cir. 1976) (cause of action stated for interference with outgoing legal mail). While the occasional delay in the posting of prisoner mail by personnel of the jail is regretable, the court finds it not to be a matter of constitutional dimension.

### 2. Incoming Mail From Attorneys

▮ As was implicitly recognized in *Wolff v. McDonnell,* 418 U.S. 539, 574–77, 94 S.Ct. 2963, 2983–85, 41 L.Ed.2d 935 (1974), prison officials may inspect all incoming prisoner mail in furtherance of the state's interest in barring the entry of contraband into a prison. In *Wolff,* the Court was presented with the issue of the extent to which prison authorities may open and inspect incoming mail from attorneys in the presence of the prisoner or whether such mail must be delivered unopened if normal detection techniques failed to indicate the presence of contraband. 418 U.S. at 575, 94 S.Ct. at 2984. The Court held that the prison management, "by acceding to a rule whereby the inmate is present when mail from attorneys is inspected, have done all, and perhaps even more, than the Constitution requires." 418 U.S. at 577, 94 S.Ct. at 2985.

In *Crowe v. Leeke,* 550 F.2d 184 (4th Cir. 1977), it was recognized that the reading of incoming attorney correspondence by prison officials may infringe a prisoner's fundamental constitutional right of access to the courts because of the inhibition and chilling effect on attorney-client communications. The following passage from *Crowe* is of particular significance here:

> We note that in several of the above cases the prison officials admittedly had been engaging in a practice of *reading* incoming mail from attorneys. *See, e. g., Taylor v. Sterrett,* [532 F.2d 462 5th Cir.] *supra,* and *Smith v. Robbins,* [454 F.2d 696 1st Cir.] *supra.* In such a context it is not unreasonable for inmates to fear that prison officials will continue their practice of reading the incoming attorney mail if they are allowed to open it outside the inmates' presence. In the present case, however, Central's postmaster, Donald Brazell, has submitted an affidavit stating that there is no censorship of incoming mail at Central and that letters are only inspected for contraband.

550 F.2d at 188. The court went on to delineate five evidentiary considerations pertinent to the determination of whether it was necessary to alter the prison official's policy of inspecting incoming attorney mail in order to protect the prisoners' Sixth Amendment right to counsel.[64]

The present case is factually distinguished from *Crowe* in that the court has found that defendants do read incoming prisoner mail from attorneys. As such, the issue presented comes within the ambit of *Taylor v. Sterrett,* 532 F.2d 462 (5th Cir. 1976), and *Smith v. Robbins,* 454 F.2d 696 (1st Cir. 1972), which were cited favorably and at length in *Crowe* as follows:

> The First Circuit, in *Smith v. Robbins,* 454 F.2d 696 (1972), affirmed the district court's order requiring attorney mail to

---

**64.** The five evidentiary considerations are:

(1) the present practice of opening attorney mail addressed to inmates, with particular reference to whether letters are read and whether copies are made for subsequent examination; (2) whether such correspondence is handled at a place and in such a manner that it is subject to observation by others; (3) what basis, if any, there is for inmate apprehension that their correspondence from attorneys is being read; (4) whether it is reasonably practicable for the warden to permit any form of random observation of the opening procedure to quiet fears that information is being gleaned from such correspondence; and (5) whether the search for contraband can be accomplished in a less intrusive manner by use of electronic or photographic equipment or even by examination of configuration and thickness of envelopes.

550 F.2d at 188–89.

be opened in the presence of the prisoner. It reached this result primarily out of concern that the opening of such mail outside the prisoner's presence might suggest to him that a prison official was reading this correspondence. The court worried that "the resulting fear may chill communications between the prisoner and his counsel." *Id.* at 697. Rejecting the justifications for the procedure raised by prison authorities, the First Circuit concluded that there was "no reason to leave such possible apprehensions on such an important matter as right to counsel in the minds of the prisoner or his attorney."

The Fifth Circuit has recently reached a similar conclusion. In *Taylor v. Sterrett*, 532 F.2d 462 (1976), the court relied on the inmates' right of access to the courts in affirming "that portion of the district court's order requiring that incoming prisoner mail from courts, attorneys, prosecuting attorneys, and probation or parole officers be opened only in the presence of the inmate." *Id.* at 475. The court noted that although most of the inmates' fears of abuses by jail officials were unfounded, "the inhibitory effect of a jail official's access to information contained in the correspondence may diminish an inmate's lawful access to the courts." *Id.* at 476. Of like effect are *Bach v. Illinois*, 504 F.2d 1100 (7th Cir.), *cert. denied*, 418 U.S. 910, 94 S.Ct. 3202, 41 L.Ed.2d 1156 (1974), and *Moore v. Ciccone*, 459 F.2d 574 (8th Cir. 1972) (concurring opinion).

550 F.2d at 188. *See also Ramos v. Lamm*, 485 F.Supp. 122 (D.Col.1979) (and cases cited at 164).

Defendants have not put forth any governmental interests which would distinguish the applicability of the *Taylor* and *Smith* holdings from the case at bar, as is their burden. *See Procunier v. Martinez*, 416 U.S. 396, 413–14, 94 S.Ct. 1800, 1811–12, 40 L.Ed.2d 224 (1974); *Taylor v. Sterrett*,

532 F.2d at 477; *Stover v. Carlson*, 413 F.Supp. 718, 722 (D.Conn.1976).

In the absence of an assertion by defendants of an affected state interest other than a generalized expression of concern for prison security, the court holds that the defendants' practice of opening correspondence from attorneys to prisoners outside the presence of the affected prisoner, and independently, the practice of reading such correspondence, are undue and unjustifiable burdens on the plaintiffs' right of access to the courts founded in the Sixth and Fourteenth Amendments. Defendants shall accordingly be enjoined from reading correspondence addressed from attorneys to prisoners and from opening such correspondence for purposes of contraband inspection or otherwise outside the presence of the affected prisoner. Defendants shall submit a plan governing incoming correspondence from attorneys in accordance with this opinion. The court's holding precluding opening of attorney mail outside the presence of the inmate does not inhibit defendants from adopting policies which, for example, require attorneys to first notify defendants of the existence of an attorney-client relationship, or require any such communication to be specifically marked as originating from an attorney. *See Wolff v. McDonnell*, 418 U.S. at 576–77, 94 S.Ct. at 2984–85.

### 3. Incoming Mail Not Related to Plaintiffs' Access to the Courts

It is generally recognized that incoming correspondence and packages not related to prisoners' access to the courts are subject to being read and inspected without the presence of the affected prisoner. As observed in *Procunier v. Martinez*, however, the reading and inspection of incoming items must be related to important governmental concerns and must be no greater than is necessary to the protection of the particular governmental interest implicated.[65] *See* 416 U.S. at 413–14, 94 S.Ct. at 1811–12. Courts have therefore required

---

**65.** While *Procunier v. Martinez* dealt specifically with the question of censorship, its holding

prison officials to promulgate regulations governing the inspection of incoming mail and packages which articulate the governmental interests sought to be served and define the specific practices which will be employed to accomplish that end. *See* cases cited *supra* note 65. The same principles apply to content-based restrictions placed upon incoming publications. *See Hopkins v. Collins*, 548 F.2d 503, 504 (4th Cir. 1977); *Guajardo v. Estelle*, 580 F.2d 748, 760–61 (5th Cir. 1978).

In the case at bar, defendants' uncertain and unarticulated procedures governing non-legal incoming correspondence and packages vest overly broad discretion in the hands of the reviewing staff member which has resulted on occasion in the arbitrary obstruction of incoming mail. Defendants shall accordingly submit a plan governing the handling and inspection of incoming correspondence and packages not related to prisoners' access to the courts.

### 4. Other Matters Related to Mail

 While the unjustified confiscation of property from packages received by prisoners at the jail may give rise to state claims or constitutional claims for the deprivation of property without due process, the evidentiary basis for such a claim by plaintiffs in this action is lacking save for one or two isolated instances. *See Bell v. Wolfish*, 441 U.S. at 557, n.38, 99 S.Ct. at 1883, n.38; *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Nickens v. White*, 536 F.2d 802 (8th Cir. 1976); *Wooten v. Shook*, 527 F.2d 976 (4th Cir. 1975). The court observes that the promulgation of a

plan regarding the handling of incoming correspondence and packages should operate to deter the arbitrary confiscation of personal items from incoming packages.

### M. Access to the Courts

The Due Process Clause of the Fourteenth Amendment guarantees every state prisoner a right of meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In *Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974), the Supreme Court recognized that the right of access applies equally to civil rights actions challenging the conditions of confinement as it does to petitions for writs of habeas corpus. Moreover, in *Williams v. Leeke*, 584 F.2d 1336 (4th Cir. 1978), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979), the affirmative obligations placed upon jail and prison administrators by the right of access were held applicable to a city jail.

Under *Bounds v. Smith*, the pivotal inquiry in each case alleging a failure to provide court access is whether under the conditions and practices existing in the challenged institution the state has fulfilled its duty to assist inmates "in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498. The means by which the state may meet its constitutional obligations are varied and need not necessarily include a law library.[66] Indeed, in *Bounds*

---

has been applied to other restrictions on prisoner mail such as reading mail, inspection for contraband and prior approval of correspondents. *See e. g., Guajardo v. Estelle*, 580 F.2d 748, 753–57 (5th Cir. 1978); *Ramos v. Lamm*, 485 F.Supp. 122, 163 (D.Col.1979); *Hardwick v. Ault*, 447 F.Supp. 116, 128–30 (M.D.Ga.1978); *Minnesota Civil Liberties Union v. Schoen*, 448 F.Supp. 960, 965–66 (D.Minn.1977). *But see Procunier v. Martinez*, 416 U.S. 396, 422–28, 94 S.Ct. 1800, 1815–18, 40 L.Ed.2d 224 (1974) (Marshall, J., concurring).

**66.** The Court stated in *Bounds* that:

[W]hile adequate law libraries are one constitutionally acceptable method to assure meaningful access to the courts, our decision here, as in *Gilmore*, does not foreclose alternative means to achieve that goal. Nearly half the States and the District of Columbia provide some degree of professional or quasi-professional legal assistance to prisoners. Brief for Respondents, Ex. B. Such programs take many imaginative forms and may have a number of advantages over libraries alone. Among the alternatives are the training of

the Supreme Court encouraged "local experimentation." 430 U.S. at 832, 97 S.Ct. at 1500.

In considering the degree to which officials must take affirmative action to assure prisoners meaningful access, the courts have been cognizant of the expected length of a prisoner's confinement:

> [I]n determining whether all inmates have adequate access to the courts, the district court need not consider those inmates whose confinement is of a very temporary nature or for purposes of transfer to other institutions. The district judge should have little difficulty, realizing the fundamental nature of the right of access, in determining those cases where the brevity of confinement does not permit sufficient time for prisoners to petition the courts.

*Cruz v. Hauck,* 627 F.2d 710, 719 (5th Cir. 1980), *citing Cruz v. Hauck,* 515 F.2d 322, 332 (5th Cir. 1975); *Leeds v. Watson,* 630 F.2d 674, 676–77 (9th Cir. 1980); *see also* Note, *The Impact of Bounds v. Smith on City and County Jails,* 67 Ky.L.J. 1064, 1077–78 (1978–79). This was also recognized by the Fourth Circuit in *Williams v. Leeke,* where the court stated:

> We should not be understood to say that every small jail must have a law library, but misdemeanants serving sentences of up to 12 months in local jails should not be left wholly without resources to prosecute potentially valid habeas claims or claims challenging the conditions of confinement or the adequacy of medical care. The provision of a law

inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working either in new prison legal assistance organizations or as part of public defender or legal services offices. Legal services plans not only result in more efficient and skillful handling of prisoner cases, but also avoid the disciplinary problems associated with writ

library might be unreasonably expensive, but making available the services of a lawyer, advanced law students or even paralegals might be quite inexpensive and much more effective. We only hold that a prisoner in a city jail is entitled to reasonable access to the courts and that is not provided one serving a substantial sentence of confinement if, without other legal assistance, he has access only to a law library which is so restricted as to be unmeaningful.

584 F.2d at 1340–41.

■ Thus, in determining whether defendants have fulfilled their constitutional duty in the case at bar, consideration must be given to the relatively transient character of the population at the Mercer County Jail. A substantial number of the inmates, however, remain at the jail for periods of time more than ample to permit the preparation, filing and presentation of potentially legitimate habeas claims and prisoner petitions challenging conditions of confinement. For them, neither law books nor the assistance of those trained in the law are provided by the jail.

The court's findings indicate that the jail staff has been uncooperative and obstructive to prisoners' efforts to file habeas corpus and civil rights actions. This attitude is plainly contrary to the defendants' duty to "shoulder affirmative obligations to assure all prisoners meaningful access to the courts." 430 U.S. at 824, 97 S.Ct. at 1496. Defendants' failure to furnish reasonable postage, writing materials and notarial services to prisoners unable to afford or

writers, see *Johnson v. Avery,* 393 U.S., at 488 [89 S.Ct. at 750]; *Procunier v. Martinez,* 416 U.S. 396, 421–422 [94 S.Ct. 1800, 1815, 40 L.Ed.2d 224] (1974). Independent legal advisors can mediate or resolve administratively many prisoner complaints that would otherwise burden the courts, and can convince inmates that other grievances against the prison or the legal system are ill-founded, thereby facilitating rehabilitation by assuring the inmate that he has not been treated unfairly.

430 U.S. at 830–31, 97 S.Ct. at 1499–1500 [Footnotes omitted].

obtain them is likewise contrary to defendants' duty. *Id., see also Guajardo v. Estelle*, 580 F.2d 748, 762 (5th Cir. 1978); *Ford v. Schmidt*, 577 F.2d 408 (7th Cir. 1978), *cert. denied*, 439 U.S. 870, 99 S.Ct. 199, 58 L.Ed.2d 181 (1978); *Oxendine v. Williams*, 509 F.2d 1405 (4th Cir. 1975); *Bryan v. Werner*, 516 F.2d 233 (3rd Cir. 1975); *Ahrens v. Thomas*, 434 F.Supp. 873, 904 (W.D. Mo.1977), *aff'd and modified*, 570 F.2d 286 (8th Cir. 1978). In addition, the failure to provide sufficient and regular telephone service in the jail operates to deprive prisoners of their right to "have a reasonable opportunity to seek and receive the assistance of attorneys." *Procunier v. Martinez*, 416 U.S. at 419, 94 S.Ct. at 1814.

 Nor is the multi-use attorney-client interview room on the jail's third floor consistent with defendants' duty to provide meaningful access to the courts. The right to access carries with it the right to seek, obtain and communicate privately with counsel. Such assistance is inevitably denied when attorney-client interviews are performed in a neglected area which contemporaneously serves as a television room, washroom and shower passageway. *See Collins v. Schoonfield*, 344 F.Supp. 257, 281 (D.Md.1972).

Based upon the foregoing, the court concludes that defendants have generally failed to meet their duty to assure the prisoners housed in the jail meaningful access to the courts. Defendants shall accordingly submit a plan consistent herewith to assure that this duty is met.

### N. Segregated Confinement

The contours of the analysis for determining whether segregated confinement violates the Eighth Amendment were delineated in *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854 (4th Cir. 1975). In *Sweet*, the court recognized that a panoply of factors including lighting, ventilation, heating, cleaning, bedding, nutrition, medical care, opportunities to wash, the duration of confinement, and whether the confinement bears a reasonable relation to the purpose for which the individual is segregated, all pertain to the constitutionality of segregated confinement. The "inescapable accompaniments of segregation" (isolation of companionship, restriction on intellectual stimulation and prolonged inactivity), were regarded in *Sweet* as not rendering segregation unconstitutional in the absence of other illegitimate deprivations. 529 F.2d at 860–61; *see also Hutto v. Finney*, 437 U.S. 678, 685–88, 98 S.Ct. 2565, 2570–72, 57 L.Ed.2d 522 (1978); *Sostre v. McGinnis*, 442 F.2d 178, 192–94, 207–09 (2d Cir. 1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972).

*Sweet* demonstrates that the cumulative effect of all the conditions of segregation must be looked to in considering an Eighth Amendment challenge. This is reflected in a number of decisions which have considered the constitutionality of strip cells. In *McCray v. Burrell*, 516 F.2d 357 (4th Cir. 1975), *cert. dismissed*, 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 782 (1976), the court held that the following conditions in a mental observation cell constituted a *per se* violation of the Eighth Amendment:

> McCray was kept naked in a barren cell without blanket or mattress and with nowhere to sit, lie or lean except against bare concrete or bare tile. He had no sink or running water; his only toilet was a hole in the floor, the cover of which was encrusted with human excrement. He was denied all articles of personal hygiene. Society would hardly tolerate such confinement for a suspected mental patient, not convicted of crime; we cannot conceive that decent society would tolerate it even for a suspected mental patient who had been convicted of crime.

516 F.2d at 363. In *Wycoff v. Brewer*, 572 F.2d 1260 (8th Cir. 1978), the court described a cell which was or could be darkened, was without a bed or other furnishings, was without toilet articles or toilet paper and in which the prisoner was confined nude as

"unquestionably . . . unconstitutional." 572 F.2d at 1263, n.5. Similarly, in *Kirby v. Blackledge*, 530 F.2d 583 (4th Cir. 1976), Justice Clark described an isolation cell which was:

> [R]eminiscent of the Black Hole of Calcutta. The allegation is that there is a strip or "Chinese cell" where prisoners are occasionally placed in which there is no bedding, no light, and no toilet facilities, save a hole in the floor. The prison officials do not deny this, and it would appear that no genuine issue exists as to it, other than the argument that it is cruel and unusual.

530 F.2d at 586. In reversing the district court's dismissal of the prisoners' complaint, Justice Clark thereafter stated in pertinent part that "[m]any of the circumstances taken alone reach the level of cruel and unusual punishment, such as the Chinese cell . . . ." 530 F.2d at 587. *See also Gates v. Collier*, 501 F.2d 1291, 1304–05 (5th Cir. 1974); *Laaman v. Helgemoe*, 437 F.Supp. 269, 309–10 (D.N.H.1977); *Johnson v. Levine*, 450 F.Supp. 648, 652, 660 (D.Md.1978), *aff'd*, 588 F.2d 1378 (4th Cir. 1978); *Owens-El v. Robinson*, 442 F.Supp. 1368, 1384–85 (W.D.Pa.1978), *enforced*, 457 F.Supp. 984, 991 (W.D.Pa.1978).

In this case, the court's rulings already set out in this opinion regarding the physical conditions of the sweat, side and juvenile cells should ameliorate the conditions which presently exist in the use of those cells for the purpose of segregation. The court therefore turns to consider the third floor dungeon separately.

As established in the court's findings of fact, the dungeon measures four by seven feet, is without windows, plumbing, floor drains or furnishings of any kind. Prisoners locked in the dungeon must defecate or urinate on the floor.

The use of the dungeon bespeaks a condition which is shocking when measured by contemporary values. The court's review of the case law reveals no instance of a similar strip cell without some form of plumbing or drain. The use of the dungeon presents a clear and present danger to the physical and mental health of any occupant and, therefore, falls within the class of intolerable and barbaric conditions condemned by the Eighth Amendment. Defendants shall accordingly be enjoined from using the dungeon to house prisoners.

O. Rehabilitation and Reading Materials

Although it is generally stated that there is no constitutional right to rehabilitation, it has been recognized that in the face of other conditions, the total absence of rehabilitation programs may violate the Eighth Amendment. *See, e. g., Finney v. Arkansas Board of Corrections*, 505 F.2d 194, 208–09 (8th Cir. 1974), *aff'd sub nom., Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *McCray v. Sullivan*, 509 F.2d 1332, 1335 (5th Cir. 1975), *cert. denied*, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975). As expressed in *Pugh v. Locke, supra*, rehabilitation is only required to the degree that the totality of the conditions of confinement are identified as causing the physical, mental or social degeneration of the prisoners:

> While courts have thus far declined to elevate a positive rehabilitation program to the level of a constitutional right, it is clear that a penal system cannot be operated in such a manner that it impedes an inmate's ability to attempt rehabilitation, or simply to avoid physical, mental or social deterioration.

406 F.Supp. at 330, *aff'd sub nom., Newman v. Alabama*, 559 F.2d at 291; *see also Bowring v. Godwin*, 551 F.2d 44, 48 n.2 (4th Cir. 1977); *French v. Heyne*, 547 F.2d 994, 1002 (7th Cir. 1976); *Laaman v. Helgemoe*, 437 F.Supp. 269, 315–17 (D.N.H.1977) (and cases cited therein).

The court has found that enforced idleness is a central fact of existence in the Mercer County Jail. The generally short duration of confinement, however, distinguishes this case from the reported decisions involving maximum security prisons in which courts have held that the totality

of conditions compel the provision of some forms of rehabilitation. Under the totality of conditions existent at the Mercer County Jail, considered together with the deference which must be accorded defendants' determination not to offer a substantial program of rehabilitation, the court believes that the undue risk of physical, mental and social degeneration of the prisoners housed there can be sufficiently deterred by the provision of opportunities for exercise to the extent previously required by this decree and the furnishing of diverse periodicals and other reading materials of sufficient quantities for the number of prisoners housed in the jail. Defendants shall submit a plan providing for reading materials accordingly.

### P. Voting

■ Under Article IV, section 1, of the West Virginia Code, pre-trial detention and conviction of a misdemeanor are not disabilities which deprive an otherwise qualified person from voting. *See also* W.Va.Code § 3–1–3 (1980 Cum.Supp.). Under the teaching of *O'Brien v. Skinner*, 414 U.S. 524, 94 S.Ct. 740, 38 L.Ed.2d 702 (1974), defendants must take steps to facilitate the prisoners' right to vote as otherwise established by West Virginia law. Defendants shall submit a plan in furtherance thereof.

### Q. Female Prisoners

#### 1. Privacy

■ The expectation of privacy retained by a pre-trial detainee or prisoner in a county jail is necessarily diminished by the government's interest in the security and effective management of the jail. *See Bell v. Wolfish*, 441 U.S. at 557, 99 S.Ct. at 1883. Notwithstanding its diminished character, however, the infringement of a prisoner's right of privacy cannot be based upon an arbitrary or irrational justification or no justification at all. Thus, in testing the reasonableness of body cavity searches in *Bell*, the Supreme Court stated that "[c]ourts must consider the scope of the

particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559, 1884.

Here the court has found that the privacy of female prisoners is severely infringed by the fact that male prisoners, trusties and deputies can peer into the side cells occupied by female prisoners and view the beds and toilet contained in each cell. The defendants' interest in jail security doubtless requires that the side cells be visible to the jail's staff. No justification has been presented, nor is one otherwise apparent, however, for permitting male prisoners and trusties to view female prisoners in their cells. Moreover, defendants have not adopted any guidelines or restrictions which assure that female prisoners will be able to use the toilet in their cell or undress without being viewed by male deputies.

In *Forts v. Ward*, 621 F.2d 1210 (7th Cir. 1980), the court recognized that the "privacy interest [of female prisoners which is] entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex." 621 F.2d at 1217. The court thereafter articulated administrative steps originated by prison administrators which would assure the right of privacy of female prisoners and which barely affected or even implicated the government's interest in security. These included the promulgation of a rule permitting female prisoners to cover the window of their cell for several minutes at established intervals so as to be able to undress and use the toilet without being subject to public view, and the provision of suitable sleepwear. 621 F.2d at 1216–17; *see also Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981).

■ The balance struck in *Forts* stands in contrast to the case at bar where the defendants have failed to take any steps to assure the privacy of female prisoners. The record does not suggest any governmental interest which would be significantly infringed by the adoption of measures similar

to those directed in *Forts.* Thus, having found that the intrusion on female prisoners' right of privacy in the Mercer County Jail is severe, and having further found this intrusion to be unjustified and not in furtherance of any governmental interest, the court holds that the privacy rights of female prisoners have been needlessly and arbitrarily infringed. Defendants shall accordingly submit a plan to accommodate the privacy right of female prisoners. The plan shall address the means by which defendants will assure that male prisoners and trusties are precluded from viewing female prisoners in their cells and that female prisoners will be supplied with suitable sleepwear and be enabled to use the toilet and undress without being needlessly observed by male guards. As an alternative, the plan should consider the feasibility of employing sufficient numbers of female staff so as not to require male deputies to keep watch over the female prisoners incarcerated in the jail.

**2. Inequality of Programs and Privileges**

Because of the limited number of female prisoners in the jail and the valid interest in security served by the isolation of female prisoners from the general male population, female prisoners are not afforded access to the preciously few programs and privileges offered at the jail.

■ The Equal Protection Clause of the Fourteenth Amendment applies to gender based classifications made in prison settings, *see Kersh v. Bounds,* 510 F.2d 585, 588 (4th Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1120, 43 L.Ed.2d 394 (1975), and requires that any disparate treatment resulting from such classifications "must serve important governmental objectives and must be substantially related to the achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457,

50 L.Ed.2d 397 (1976). As applied in the prison context, this form of heightened rational basis scrutiny for equal protection purposes has been held to require "parity" (as opposed to identity) in the treatment of male and female prisoners. See *Batton v. North Carolina,* 501 F.Supp. 1173, 1176–77 (E.D.N.C.1980); *Bukhari v. Hutto,* 487 F.Supp. 1162, 1171–72 (E.D.Va.1980); *Glover v. Johnson,* 478 F.Supp. 1075, 1078–79 (E.D.Mich.1979); *see also Smith v. Bounds,* 538 F.2d 541, 545 (4th Cir. 1976), *aff'd sub nom., Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

■ Although common sense suggests that the defendants may for reasons of security legitimately exclude female prisoners from the programs offered male prisoners, defendants have failed to identify an important governmental objective served in the course of denying equivalent programs and privileges for female prisoners. Nevertheless, the court recognizes that the number of female inmates is but a small fraction of the jail's population at any given time. On occasion, there are no female inmates. Usually a female prisoner is incarcerated no more than a few hours or days. Consequently, arranging special programs for most of the female inmates would avail little or nothing. However, the longer term female prisoners would ordinarily be able to participate in educational and recreational programs comparable to those accorded the male inmates, and they should also be enabled to earn privileges equivalent to that of trusty status which is now conferred on males. As to the longer term female prisoner, the defendants must take steps to achieve parity.[67] In doing so, the defendants may take into account the totality of prison conditions as affecting the male inmates on the one hand and the female inmates on the other. Discriminatory treatment unrelated to such valid concerns as prison security are to be remedied. Defendants shall submit a plan accordingly.

**67.** Application of the strict scrutiny equal protection analysis for gender-based classifications recently adopted by the West Virginia Supreme Court of Appeals in *Peters v. Narick,* 270 S.E.2d 760, 766 (W.Va.1980), renders the same result.

## IV.

During the pendency of this case, the defendants have undertaken to correct some of the constitutional deficiencies which abound in the operation and structure of the Mercer County Jail. These efforts have in large measure been in response to the court's orders of November 5, 1980, and January 21, 1981, granting temporary relief and requiring *inter alia* an increase of approximately fifty per cent in the number of full-time jail deputies, visual surveillance of segregated inmates at least once every ten minutes, psychiatric or psychologic examination of segregated inmates, daily exercise for inmates segregated longer than thirty days, increased visitation privileges and virtual elimination of drunk tank usage. Under the administration and guidance of current Sheriff Donald Hare, who assumed office just seven months ago, significant strides have been made in the course of compliance with the court's temporary relief decrees. The decrees of November 5, 1980, and January 21, 1981, shall remain in effect until the further order of the court except that the reports referred to therein shall henceforth be made only to plaintiffs' counsel.

Accordingly, it is hereby ORDERED that:

1. Defendants shall file the plans required by sections III–A, B, C, D, E, F, G, H, I, J, K, L, M, O, P and Q on or before October 12, 1981. Conference between the court and counsel respecting the plans so filed shall be held at Charleston at 1:00 p. m., on October 27, 1981. Hearing on the plans shall be held at 10:00 a. m. on November 24, 1981, in the Federal Courtroom, Bluefield, West Virginia; and

2. For the reasons stated in section III–N, defendants shall be, and they hereby are, permanently enjoined from using the dungeon on the third floor of the Mercer County Jail to house a prisoner.

3. The reports required by the orders of November 5, 1980, and January 21, 1981, shall henceforth be made only to plaintiffs' counsel of record in this case and not to the court.